```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/6/2025
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE CHINA CONSTRUCTION BANK CORP.

---

This Document Relates To:

HOMEOWNERS OF AMERICA INSURANCE
COMPANY, HOMEOWNERS OF AMERICA HOLDING
CORPORATION, PORCH.COM, INC., and PORCH
GROUP, INC.,

                    Plaintiffs,

          – against –

CHINA CONSTRUCTION BANK CORPORATION,
CHINA CONSTRUCTION BANK (ASIA)
CORPORATION LIMITED, and CHINA
CONSTRUCTION BANK NEW YORK BRANCH,

                    Defendants.

**24 Civ. 3591 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Homeowners of America Insurance Company ("HOA"), Homeowners of America Holding Corporation ("HOAHC"), Porch.com, Inc. ("Porch"), and Porch Group, Inc. ("Porch Group") (collectively, "Plaintiffs") bring this action against China Construction Bank Corporation ("CCBC"), China Construction Bank (Asia) Limited ("CCB Asia"), and China Construction Bank New York Branch ("CCBNY") (collectively, "Defendants"). In their First Amended Complaint, (Dkt. No. 55, "FAC") Plaintiffs allege that Defendants' employees conspired to perpetrate a reinsurance fraud by issuing fraudulent letters of credit ("LOCs") to insurance companies,

1

including HOA, thus falsely guaranteeing access to reinsurance funds to cover Plaintiffs' insurance risk obligations. Plaintiffs assert claims against all Defendants for fraud, negligent supervision and retention, and negligence. (See FAC at 42-47.)

Defendants CCBC and CCBNY jointly move to dismiss the claims against them pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2) and 12(b)(6), arguing that Plaintiffs fail to establish personal jurisdiction over their claims and also fail to state a claim for relief. (See "CCBC/CCBNY Mot.," Dkt. No. 91.) CCB Asia separately moves to dismiss on the same grounds. (See "CCB Asia Mot.," Dkt. No. 75.) In connection with Defendants' Rule 12(b)(2) motions, Plaintiffs have moved for jurisdictional discovery. (See Dkt. No. 93.)

For the reasons stated below, CCBC/CCBNY's Motion to dismiss is **GRANTED**; CCB Asia's Motion is **DENIED**; and Plaintiffs' motion for jurisdictional discovery is **DENIED**.

## I.    BACKGROUND

A. Factual Background[1]

---

[1] The following facts are taken from Plaintiffs' FAC, which the Court must accept as true for purposes of resolving Defendants' respective motions to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 490 (S.D.N.Y. 2013). In reviewing Defendants' motions, the Court may consider all documents that Plaintiffs attached to the pleadings, referenced in the FAC, and have in their possession, as well as documents of which Plaintiffs had knowledge, and upon which Plaintiffs relied in

1. <u>The Parties</u>

HOA is a Texas-based property and casualty insurance company, and a wholly owned subsidiary of HOAHC, a Delaware corporation with its principal place of business in Irving, Texas. (<u>See</u> FAC ¶ 11.) Porch is a Delaware corporation with its principal place of business in Seattle, Washington and is wholly owned by Porch Group, also a Delaware corporation with its principal place of business in Seattle, Washington. (<u>See</u> <u>id.</u> ¶ 9.) In 2023, Porch acquired all right, title and interest in claims, including this lawsuit, arising out of the Quota Share Reinsurance Agreement ("Reinsurance Agreement") between HOA and White Rock Insurance (SAC) Ltd. ("White Rock"). (<u>See</u> <u>id.</u> ¶ 12.)

CCBC is a foreign bank headquartered in China. (<u>See</u> <u>id.</u> ¶ 13.) CCBC conducts business in New York primarily through its New York branch office, CCBNY, which has operated in New York since July 2009. (<u>See</u> <u>id.</u>) CCBNY is directly controlled and managed by CCBC's President, is not incorporated separately from CCBC, and is not a CCBC subsidiary. (<u>See</u> <u>id.</u> ¶ 17.) CCBNY is registered as a Foreign Banking Organization with the Federal Reserve, as a Foreign Branch with the New

---

bringing this action. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002). The Court may also consider matters of which judicial notice may be taken. <u>See</u> <u>id.</u>

York Department of Financial Services ("NYSFDFS") and is listed by the National Association of Insurance Commissioners ("NAIC") as a qualified U.S. financial institution authorized to issue LOCs as collateral in reinsurance arrangements. (See id. ¶ 16.) CCBC's 2022 U.S. Resolution Plan submitted to the Federal Reserve identified LOC issuance as one of CCBNY's "core business lines." (See id. ¶ 51.)

CCB Asia is a bank headquartered in Hong Kong, China, and is a wholly owned subsidiary of CCBC. (See id. ¶ 14.) CCB Asia is CCBC's primary commercial banking platform in Hong Kong. (See id.) CCBC retains control over CCB Asia and maintains strict oversight over it. (See id.)

2. The Reinsurance Arrangement

In a reinsurance arrangement, an insurance company (the "cedent") transfers a portion of the risk from specific policies it underwrites to another insurer (the "reinsurer"), effectively sharing or shifting part of the risk. (See id. ¶ 36.) The reinsurer takes on some of the financial risk and, in return, receives a share of the premiums from the underlying insurance policies. (See id. ¶ 37.) This risk transfer allows the cedent to reduce the financial reserves needed to protect policy holders, thereby increasing its ability to underwrite more insurance. (See id.)

In 2021, HOA sought to obtain a new reinsurance contract. HOA's reinsurance broker, Gallagher Re ("Gallagher") introduced HOA to Vesttoo, an Israeli start-up company that identified itself as an "insurance marketplace." (See id. ¶ 38.) Vesttoo facilitated reinsurance contracts through specialized financial arrangments coordinated by White Rock, a subsidiary of the global insurance services company Aon plc. (See id.) Under White Rock and Vesttoo's specialized financial arrangements, a cedent would cede its risk to a "transformer entity," which would then convert the risk into an investment account called a segregated cell account,[2] effectively securitizing the insurance policy. (See id. ¶¶ 40-41.) Once the transformer entity placed the securitized insurance policy into a segregated cell account, it would transfer ownership of the segregated cell account and its related funds to a special purpose vehicle created by Vesttoo, called the Vesttoo Bay Fund. (See id. ¶ 41.)

In turn, the Vesttoo Bay Fund would sell interests in the segregated cell account to investors by entering into limited partnership agreements with them. (See id. ¶ 42.) Those agreements gave investors a share in the segregated

---

[2] A segregated cell account is an account in which the assets linked to the account are available only to meet the liabilities of that account's owners and creditors. (See id. ¶ 40.)

cell account's premiums associated with the account's insurance risk. In return, the investors agreed to provide collateral to show there was enough financial backing to cover the insurance risk in the segregated cell account in the event a policy had to be paid out. (See id.) The collateral investors provided was typically in the form of a LOC for the benefit of the cedent insurer issued by a qualified U.S. financial institution. (See id. ¶ 43.) The LOC guaranteed that sufficient funds would be available to cover the cedent's insurance risks, thereby enabling the cedent to reduce its financial reserves. (See id. ¶ 45.)

3. The Collateral Letters and Letter of Credit

As part of HOA's reinsurance arrangement with Vesttoo and White Rock, a third-party investor, Yu Po Finance Limited ("Yu Po"), agreed to purchase an interest in the premiums of HOA's segregated cell account. (See id. ¶ 44.) "China Construction Bank" was designated to issue an LOC on Yu Po's behalf. (See id.) On December 31, 2021, HOA entered into the Reinsurance Agreement with White Rock for reinsurance coverage beginning on January 1, 2022. (See id. ¶ 53.) The contract attached a letter dated December 29, 2021 (the "December Collateral Letter"), prepared by Yu Po's representatives, confirming that Yu Po would provide an LOC for $228 million, issued by CCBC. (See "Ex. A," Dkt. No. 55-

1.) The December Collateral Letter was signed by a representative of Yu Po and by CCBC Senior Vice President Xu Yingde ("Yingde"). (See Ex. A at 3.) The Letter also contained a red stamp labeled "China Construction Bank Corp." next to Yingde's signature. (See id.; FAC ¶ 57.)

Before accepting CCBC as the LOC issuer, HOA reviewed publicly available information about the bank and its LOC issuance practices. (See FAC ¶¶ 54-55.) This included CCBC's 2020 Annual Report, which stated that CCBC routinely issues LOCs and had issued the RMB equivalent of over $6 billion in LOCs. (See id. ¶ 55.) HOA also confirmed that CCBC and its New York branch (CCBNY) were listed on the NAIC's List of Qualified U.S. Financial Institutions ("NAIC List") - banks approved to issue LOCs for reinsurance collateral.[3] (See id. ¶ 55.) Furthermore, Gallagher, HOA's reinsurance broker, accepted the December Collateral Letter as valid and reliable collateral for the reinsurance transaction. (See id. ¶ 119.)

Subsequently, in December 2022, HOA received an updated version of the December Collateral Letter (the "Updated December Collateral Letter") which was identical to the December Collateral Letter, but increased the total amount of

---

[3] In order to be placed on the NAIC list, a financial institution must have been assigned a credit rating from a Nationally Recognized Statistical Rating Organization of "Baa/BBB" or better for its LOCs or long-term debt obligations. (See FAC ¶ 48.)

collateral committed from $228,000,000 to $229,272,824. (See "Ex. B," Dkt. No. 55-2.) The Updated December Collateral Letter contained the same signature by Yingde and the red ink stamp. (See id. at 4; FAC ¶ 59.)

HOA received the Updated December Collateral Letter in a UPS package sent to its corporate offices in Irving, Texas. The UPS package label showed that it was shipped directly from one of CCB Asia's branch offices in Hong Kong. (See Ex. B at 2.) The label further identified a specific CCBC employee who sent the package as "Yin Lam" ("Lam") of "China Construction Bank." (See id. at 2; FAC ¶ 60.) At that time, Lam was allegedly employed by CCBC and CCB Asia as Relationship Manager and was listed in the Hong Kong Monetary Authority ("HKMA") database as an employee at CCB Asia from August 24, 2021, through July 26, 2023. (See FAC ¶ 86.)

When HOA received the Updated December Collateral Letter directly from Lam, it understood that the mailing was valid and reliable based on its past research into CCBC's annual reports and regulatory filings which confirmed that employees of CCBC were authorized to issue LOCs on its behalf. (See id. ¶ 63.) Gallagher and White Rock raised no concerns regarding the validity of the commitments made in the Updated December Collateral Letter nor Lam's authority to send it. (See id.)

On December 30, 2022, HOA received another letter from CCBC through Gallagher titled "Irrevocable Standby Letter of Credit" ("Standby Letter of Credit"). (See "Ex. C," Dkt. No. 55-3.) Unlike the past letters, which merely indicated an intention to issue a LOC in the future, the Standby Letter of Credit appeared to be an actual, operative LOC. It was issued on CCBC letterhead listing CCBNY's address (see FAC ¶ 66) and expressly stated that CCBC "hereby establish[es] this clean, irrevocable, and unconditional Standby Letter of Credit . . . in your favor as beneficiary for drawings up to USD 300,000,000 (USD Three hundred million) effective immediately." (Ex. C at 2.) The letter also confirmed that the "Standby Letter of Credit is issued, presentable and payable" at CCBNY's address. (See id.)

In January 2023, HOA received a hard copy of the Standby Letter of Credit by mail. (See "Ex. D," Dkt. No. 55-4; FAC ¶ 69.) The package listed the same CCB Asia branch return address as the one that delivered the Updated December Collateral Letter and identified Lam as the sender. (See Ex. D at 3; FAC ¶ 70.) Upon receiving the Standby Letter of Credit by mail, HOA understood CCBC to have undertaken the LOC risk for HOA's reinsurance transaction and neither White Rock nor Gallagher questioned the validity of the Standby Letter of Credit. (See FAC ¶ 71.) Moreover, HOA understood that the

increased coverage in the Standby Letter of Credit and the Updated December Collateral Letter was intended to accommodate the growing scale of its insurance needs. (See id.)

### 4. HOA's Loss of Reinsurance Coverage

On July 19, 2023, after hearing reports that certain LOCs used in Vesttoo transactions were invalid, HOA delivered a Sight Draft to CCBNY seeking to draw on its LOC. (See id. ¶ 73.) That same day, HOA's Head of Reinsurance emailed three employees of Defendants – Lam, Phillip Ohara, and Allison Lee – to notify them of the Sight Draft. (See id. ¶ 73.) HOA found Lam's email address by looking at his signature block in correspondence with Gallagher regarding the LOCs. (See id. ¶ 74.) Lam's signature block identified Lam as "Relationship Manager, Causeway Bay Branch, Consumer Banking Division" and listed his email as Chun-Yin.Lamm@asia.ccb.com. (See id. ¶ 75.) HOA's email to Lam did not bounce back with an error message, suggesting that the email remained valid. (See id. ¶ 76.) None of the CCBC employee recipients replied to HOA's email. (See id. ¶ 77.) Instead, counsel from Sullivan & Cromwell LLP ("Sullivan & Cromwell") replied stating that the reference number in the Standby Letter of Credit "does not match against CCBNY's records" and denied that CCBC/CCBNY issued the Standy Letter of Credit. (See id. ¶ 78.) In a

subsequent phone call, the attorney from Sullivan & Cromwell suggested that the letterhead and red ink stamp on HOA's LOC from CCBC were inauthentic and that CCBC could provide a sworn statement attesting to that effect. (See id. ¶ 79.) CCBC counsel subsequently backtracked on this offer, stating by letter that "CCB does not see a need to provide any attestations at this time." (Id. ¶ 80.)

Faced with the risk of significant loss and undercapitalization, HOA terminated its reinsurance contract with Vesttoo, as the lack of a valid LOC left the reinsurance arrangement without real reinsurance coverage. (See id. ¶ 81.) Plaintiffs reported a $48.2 million charge in their Q2 2023 financials to reflect this loss. (See id.) HOA then replaced its reinsurance at a higher cost and recorded a $25 million loss in surplus capital due to a withdrawal Vesttoo made from the segregated cell account. (See id.) Additionally, due to HOA's loss of reinsurance coverage, the Texas Department of Insurance placed HOA under temporary supervision leading to additional costs, and HOA has paid $80 million out-of-pocket to cover insurance claims that it thought were reinsured. (See id. ¶ 82.) Porch Group's stock price subsequently dropped over forty percent in the wake of the news that Vesttoo had issued invalid LOCs. (See id. ¶ 83.)

B. <u>Procedural Background</u>

Plaintiffs commenced this action against Defendants on May 9, 2024. (<u>See</u> "Complaint," Dkt. No. 1). On September 25, 2025, Plaintiffs amended their Complaint as a matter of course pursuant to Rule 15(a)(1)(B) adding, in part, allegations in support of the Court's exercise of personal jurisdiction over Defendants. (<u>See</u> FAC.) The FAC alleges that Defendants' employees, specifically Lam, conspired to defraud Plaintiffs through the issuance of false LOCs causing Plaintiffs harm. The FAC further alleges that Defendants failed to adequately supervise Lam or implement proper fraud-detection protocols, which directly and proximately caused Plaintiffs' damages. Based on these allegations, the FAC asserts three claims: (1) fraud, under the doctrines of *respondeat superior* and apparent authority, (2) negligent supervision and retention, and (3) negligence.[4]

The parties exchanged pre-motion letters pursuant to the Court's individual practices in anticipation of Defendants' Motion to Dismiss. (<u>See</u> Dkt. No 68.) Unable to resolve the

---

[4] On June 7, 2024, another group of plaintiffs (the "Incline Casualty Plaintiffs") filed a lawsuit against Defendants in this Court. (<u>See</u> <u>Incline Casualty Company et al. v. China Construction Bank Corp. et al.</u>, 24-cv-4392, Dkt. No. 1) (the "Related Action"). Plaintiffs in the Related Action make similar allegations and assert similar claims against Defendants. On August 7, 2024, on consent of all parties, the Court consolidated the instant action and the Related Action for pretrial purposes. (<u>See</u> Dkt. No. 36.)

12

dispute through pre-motion letters, CCBC and CCBNY jointly filed a Motion to Dismiss, while CCB Asia filed a separate Motion to Dismiss, both under Rule 12(b)(2) and Rule 12(b)(6), accompanied by supporting memoranda of law. (See "CCBC & CCBNY Mem.," Dkt. No. 80; "CCB Asia Mem.," Dkt. No. 76). Plaintiffs jointly filed oppositions to both motions (see "Pls.' Opp'n to CCBC & CCBNY," Dkt. No. 104; "Pls.' Opp'n to CCB Asia," Dkt. No 103), and Defendants filed replies. (See "CCBC & CCBNY Reply," Dkt. No. 108; "CCB Asia Reply," Dkt. No. 110.)

## II.  STANDARD OF REVIEW

### A. Rule 12(b)(2) – Lack of Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of showing that the court maintains jurisdiction over the defendant. See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003). However, "prior to discovery, a plaintiff challenged by a jurisdiction-testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks omitted). "[A] prima facie showing of jurisdiction does not mean that [the] plaintiff must show only some evidence that [the] defendant is subject to jurisdiction; it means that

[the] plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." Bellepoint, Inc. v. Kohl's Dep't Stores, Inc., 975 F. Supp. 562, 564 (S.D.N.Y. 1997). A plaintiff may "make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited . . .would suffice to establish jurisdiction over the defendant." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks omitted)).

When evaluating a motion to dismiss for lack of personal jurisdiction, courts "may consider materials outside the pleadings, including affidavits and other written materials." Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015). Pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. See Whitaker, 261 F.3d at 208. "However, conclusory allegations are not enough to establish personal jurisdiction." Gmurzynska v. Hutton, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (internal quotation marks omitted); see also Yellow Page Sols, Inc. v. Bell Atl. Yellow Pages Co., No. 00 Civ. 5663, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) ("The plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be

14

factually supported." (internal citations and quotation marks omitted)).

B. <u>Rule 12(b)(6) – Failure to State a Claim</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct" — there is not "a probability requirement at the pleading stage." <u>Lynch v. City of New York</u>, 952 F.3d 67, 75 (2d Cir. 2020) (quoting <u>Twombly</u>, 550 U.S. at 556); <u>see</u> <u>Iqbal</u>, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" <u>Liboy v. Russ</u>, No. 22 Civ. 10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting <u>Twombly</u>, 550 U.S. at 555).

In reviewing a motion to dismiss under Rule 12(b)(6), the district court must "constru[e] the complaint liberally,

accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." <u>Goldstein v. Pataki</u>, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). The district court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." <u>Garcia v. Lewis</u>, No. 05 Civ. 1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005).

### III. <u>CCBC/CCBNY'S MOTION TO DISMISS</u>

CCBC/CCBNY[5] argue that the FAC should be dismissed because (1) Plaintiffs have failed to establish that the Court may exercise personal jurisdiction over CCBC/CCBNY pursuant to Rule 12(b)(2); (2) the FAC improperly relies on group pleading in violation of Federal Rule of Civil Procedure 8(a) ("Rule 8(a)"); (3) the SAC fails to state a claim against CCBC/CCBNY for fraud, negligent supervision, and negligence under Rule 12(b)(6).

### A. <u>Personal Jurisdiction</u>

The Court starts, as it must, with personal jurisdiction. <u>See</u> <u>Romero v. 88 Acres Foods, Inc.</u>, 580 F. Supp.

---

[5] CCBC and CCBNY are treated as the same entity. <u>See</u> <u>Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC</u>, 692 F.3d 42, 51 (2d Cir. 2012) (holding that where a New York branch of a foreign bank "is not separately incorporated, [it] has no legal identity separate from [the parent bank]".)

3d 9, 14 (S.D.N.Y. 2022). In diversity cases, personal jurisdiction over a non-domiciliary defendant is determined by reference to the law of the state in which the court sits. See Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997). Thus, the Court will assess diversity jurisdiction according to New York law.

In the FAC, Plaintiffs advance three grounds for this Court's exercise of personal jurisdiction over CCBC/CCBNY. First, both CCBC and CCBNY consented to personal jurisdiction in this Court by agreeing to the forum-selection clause in their application for inclusion on the NAIC List. Second, CCBC and CCBNY consented to specific personal jurisdiction based on the choice-of-law provision in the Updated December Collateral Letter. Third, CCBC and CCBNY's business activities in New York bring them within the reach of New York's long-arm statute. The Court need not address the first two grounds for personal jurisdiction because it is persuaded that New York's long long-arm reaches the conduct alleged here. See Esso Expl. and Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp., 397 F. Supp. 3d 323, 332 n.2 (S.D.N.Y. 2019).

1. N.Y. C.P.L.R. Section 302(a)(1)

New York Civil Practice Law and Rules Section 302(a)(1) ("Section 302(a)(1)") allows a court to "exercise personal jurisdiction over" a non-domiciliary defendant who, "in

person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state" as long as the cause of action arises from the transaction or contract. N.Y. C.P.L.R. § 302(a)(1). "To determine the existence of jurisdiction under Section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (quoting Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 850 N.E.2d 1140, 1142 (2006).

A claim arises from a particular business transaction "when there is some articulable nexus between the business transacted and the cause of action sued upon." Sole Resort, S.A. De C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotation marks omitted). There must be a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Licci ex rel. Licci v. Lebanese Can. Bank, SAL, 732 F.3d 161, 168-69 (2d Cir. 2013) (internal quotation marks omitted). "[W]hether a plaintiff's claim arises from a defendant's New York contacts depends upon the nature and elements of the particular causes of action pleaded . . . [W]here at least one element arises from New York contacts,

the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." Id. at 169 (internal quotation marks omitted).

It is undisputed that CCBC transacts business in New York through CCBNY. Whether Plaintiffs' claims arise from these transactions, however, is a closer question. Plaintiffs maintain that there is an "articulable nexus" between their claims and CCBC's New York contacts because CCBNY's status as a NAIC-authorized financial institution was essential to the fraudulent scheme. (See Pls.' Opp'n. to CCBC & CCBNY at 14-16.) The Court agrees, and concludes that Plaintiffs' fraud claim, negligent supervision claim, and negligence claim arise from CCBC's New York transactions.

"A plaintiff must establish personal jurisdiction with respect to each claim asserted." Weiss v. National Westminster Bank PLC, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016) (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004)). With respect to Plaintiffs' fraud claim, the FAC alleges that Plaintiffs, in part, relied on the fraudulent Updated December Letter and Standby Letter of Credit signed by CCBC because CCBC listed its New York Branch, CCBNY, on the NAIC List as an NAIC-approved issuer of LOCs in reinsurance transactions. (See FAC ¶¶ 67, 117.) This reliance was further buttressed by the Standby Letter of Credit's

19

bearing of CCBNY letterhead and its representation that the LOC was made payable at CCBNY's address. (See id. ¶ 66.)

Defendants are correct that a causal connection between CCBC's New York contacts and Plaintiffs' injury is not necessarily sufficient to meet the second prong of New York's long-arm statute. (See CCBC & CCBNY Opp'n at 9.) CCBC's listing of CCBNY as a reliable LOC issuer, however, is not a stray fact in the chain of causation leading to the purported fraud. Instead, CCBC's operation of CCBNY and placement of it on the NAIC List played a key role in allegedly inducing Plaintiffs to trust CCBC as a reliable issuer of LOCs.

Accordingly, CCBC's contacts with New York, which include establishing CCBNY and listing it on the NAIC List, are not "completely unmoored" from Plaintiffs' claim for fraud. See Licci, v. Lebanese Canadian Bank, 984 N.E.2d 893, 900-01.

The Court will also exercise personal jurisdiction over Plaintiffs' negligent supervision claim because the FAC sufficiently alleges, for jurisdictional purposes, that CCBNY had notice that Lam had issued several other LOCs after receiving an inquiry from another cedent. (See FAC ¶¶ 112-13.) Plaintiffs' negligent supervision claim is based, at least in part, on the allegation that CCBC, through CCBNY, knew or should have known of Lam's propensity to carry out

fraud against others. Accordingly, there is a substantial nexus between this correspondence with CCBNY and Plaintiffs' negligent supervision claim, regardless of the claim's merits.

Similarly, Plaintiffs' claim of negligence and its purported connection to New York rises and falls with the FAC's allegation that CCBNY received notice of Lam's purported fraud and failed to act and implement safeguards to prevent such fraud. For these reasons, the Court has personal jurisdiction over Defendants CCCB and CCBNY.

B. Rule 8(a) and Lam's Employment Status

CCBC/CCBNY contend that the FAC violates Rule 8(a) and Rule 9(b) by referring to CCBC, CCBNY, and CCB Asia as "CCB" or "Defendants" repeatedly throughout the FAC. (See CCBC & CCBNY Mem. at 18.) "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading' fails to give each defendant fair notice of the claims against it." Holmes v. Allstate Corp., No. 11 Civ. 1543, 2012 WL 627238, at *22 (S.D.N.Y. Jan. 27, 2012). "[A] plaintiff cannot simply 'lump' defendants together for pleading purposes." Liu Jo S.P.A. v. Jenner, 630 F. Supp. 3d 501, 521 (S.D.N.Y. 2022). However, "nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."

Vantone Grp Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd., No. 13 Civ. 7639, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015). The key inquiry regarding Rule 8(a) is whether adequate notice is given to enable the defendant to prepare for trial. See Wynder v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004).

While the FAC occasionally distinguishes among the three entities, it frequently uses the acronym "CCB" when alleging facts central to Plaintiffs' claims. For example, it refers to CCB Asia's Hong Kong office, from which Lam sent the LOCs, as "CCB's Hong Kong S.A.R. China, branch office." (FAC ¶ 63.) The FAC also describes the letterhead on the Standby Letter of Credit as that of "CCB," even though "China Construction Bank Corp." is listed above the address. (Id. ¶ 66.) Finally, the FAC refers to Lam as a "CCB" employee working in "CCB's Consumer Banking Division, using a "CCB" email address. (See FAC ¶¶ 75-76, 85.)

The FAC provides sufficient detail to allow all Defendants to answer and prepare for trial. Plaintiffs clearly allege that Lam, operating out of CCB Asia's offices, sent fraudulent LOCs bearing the signature of a CCBC executive and CCBC's corporate stamp. The FAC also adequately describes the relationship between CCBC, CCBNY, and CCB Asia, and the role that CCBNY's NAIC-approved status played in the alleged

scheme. Accordingly, the Court declines to dismiss the FAC on the basis that it violates Rule 8(a) and Rule 9(b).[6]

That being said, Plaintiffs' use of "CCB" obscures a critical pleading deficiency – namely, that the specific allegations in the FAC support a strong inference that Lam was employed by CCB Asia, not by CCBC or CCBNY. Specifically, the FAC alleges that Lam sent the LOCs from CCB Asia's Hong Kong branch office, that Lam's official email domain was "associated with CCB Asia," and that Lam's position of "Relationship Manager" is associated with CCB Asia. (See FAC ¶¶ 62, 74-75, 91.) In addition, the FAC alleges that Lam was listed in the Hong Kong Monetary Authority database as an employee of CCB Asia, not CCBC or CCBNY. (See id. ¶ 86.) CCB Asia is alleged to be a subsidiary of CCBC (see id. ¶ 14), and under New York law, a subsidiary is a "legally distinct entit[y]" from its parent corporation. Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern., Inc., 2 F.3d 24 (2d Cir. 1993). Thus, the FAC's specific factual allegations concerning Lam's affiliation with CCB Asia undermine Plaintiffs' conclusory characterization of Lam as a "CCB" (i.e., CCBC or CCBNY) employee. See Hirsch v. Arthur

---

[6] The FAC also satisfies Rule 9(b), because it specifies the statements that Plaintiffs contend were fraudulent, identifies the speaker, states where and when the statements were made, and explains why the statements were fraudulent. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995)
("[C]onclusory allegations need not be credited, however,
when they are belied by more specific allegations of the
complaint.") Plaintiffs' failure to adequately allege that
Lam was employed by CCBC/CCBNY is significant, as it bears
directly on whether the FAC states a claim for relief, as
discussed below.

    C. <u>Fraud Claim Against CCBC/CCBNY</u>

       Plaintiffs' fraud claim against CCBC/CCBNY is based on
their contention that CCBC/CCBNY is vicariously liable for
Lam's and other "CCB" employees'[7] conduct in perpetrating the
alleged fraud. Plaintiffs allege that Lam had both actual and
apparent authority to issue the LOCs on behalf of CCBC/CCBNY
and, alternatively, that CCBC/CCBNY should be held liable for
Lam's actions under the doctrine of *respondeat superior*.
CCBC/CCBNY move to dismiss the fraud claim arguing that (1)
Lam lacked actual and apparent authority to issue the LOCs,
(2) Plaintiffs fail to allege reasonable reliance on Lam's
purported apparent authority to issue the LOCs, and (3)
Plaintiffs fail to allege an employment relationship between
Lam and CCBC/CCBNY for purposes of their *respondeat superior*

---

[7] Plaintiffs' reference to "other employees'" involvement in the purported fraudulent scheme does not satisfy the requirements of Rule 9(b), which requires plaintiffs to, in part, "identify the speaker" of the fraudulent statement or omission. Fed. R. Civ. P. 9(b).

theory. For the reasons discussed below, Plaintiffs fail to plead sufficient facts to hold CCBC/CCBNY liable for Lam's fraudulent conduct on all three theories.

   1. <u>Actual Authority</u>

     To demonstrate an agency relationship between Lam and CCBC/CCBNY under New York law - and thus hold CCBC/CCBNY vicariously liable for Lam's alleged fraud - Plaintiffs must plead sufficient facts to show that Lam had actual or apparent authority to act on CCBC/CCBNY's behalf. <u>See</u> <u>Highland Capital Mgmt. LP v. Schneider</u>, 607 F.3d 322, 327 (2d Cir. 2010). "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." <u>Meyer v. Holley</u>, 537 U.S. 280, 285 (2003) (collecting cases). For the reasons discussed below, Plaintiffs have failed to allege that Lam had actual or apparent authority to issue the LOCs on behalf of CCBC/CCBNY.

     To establish actual authority, Plaintiffs must allege "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." <u>Comm. Union Ins. V. Alitalia Airlins, S.p.A.</u>, 347 F.3d 448, 462 (2d Cir. 2003). Whether an agent had actual authority may be determined "by either express or implied . . . words and

conduct [between the principal and the agent] as construed in light of the surrounding circumstances.'" <u>Cromer Fin. Ltd. v. Berger</u>, Nos. 00 Civ. 2284, 00 Civ. 2498, 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002) (quoting <u>Riverside Rsch. Inst. v. KMGA, Inc.</u>, 489 N.Y.S.2d 220, 223 (App. Div. 1st Dep't 1985)). Plaintiffs must also show that "the principal . . . maintain[ed] control over key aspects of the undertaking." <u>Comm. Union Ins. Co.</u>, 347 F.3d at 462. However, "the control asserted need not include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 522 (2d Cir. 2006) (quotation marks and citation omitted).

"Commonly, an outsider will not be privy to the details of what conversations or conduct took place between a principal and the agent." <u>Amusement Indus., Inc. v. Stern</u>, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010). Thus, to sufficiently allege an actual agency relationship, "a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority." <u>Skanga Energy & Marine Ltd. v. Arevenca, S.A.</u>, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012).

26

Here, Plaintiffs have failed to allege that CCBC or CCBNY granted Lam actual authority to act on their behalf with respect to the issuance of the LOCs. As already discussed, the specific allegations in the FAC suggest that Lam was actually an employee of CCB Asia. (See FAC ¶¶ 62, 74-75, 86, 91.) Nor have Plaintiffs plausibly alleged facts indicating that CCBC or CCBNY, not CCB Asia, exercised control over Lam. See Maung Ng We v. Merrill Lynch & Co., Inc., 2000 WL 1159835, at *4 (S.D.N.Y. 2000). While "a parent corporation may be held accountable for the wrongs of its subsidiary under an agency theory, courts have long ago concluded that such a finding is remote." Spagnola v. Chubb Corp., 264 F.R.D. 76, 89 (S.D.N.Y. 2010) (citing Maung Ng We, 2000 WL 159835 at *4)). The FAC contains no factual allegations showing that CCBC or CCBNY directed or controlled Lam's actions or CCB Asia. Plaintiffs assert in conclusory fashion that CCBC controls CCB Asia. (See FAC ¶ 15.) But such bare assertions are insufficient. See Spagnola, 264 F.R.D. at 90 n.14 (conclusory allegations that a subsidiary was an agent of the parent company need not be credited at the motion to dismiss stage); Coraggio v. Time Inc. Magazine Co., No. 94 Civ. 5429, 1995 WL 242047, at *3 (S.D.N.Y. April 26, 1995) (allegation that parent "controls" subsidiary held insufficient to plead single employer liability under Title VII).

Plaintiffs also attempt to show that CCBC/CCBNY controlled CCB Asia by referencing a regulatory filing in which CCBC purportedly refers to its branches and subsidiaries - including CCBNY and CCB Asia - as part of a single "universal bank." (FAC ¶ 29.) However, the full statement, as used in CCBC's 2022 Reduced U.S. Resolution Plan, merely states that "[a]s a universal bank, CCB - the ultimate parent company of all subsidiaries, including CCBNY - is headquartered in Beijing, China." China Construction Bank, 2022 Reduced U.S. Resolution Plan Public Section Submission at 4, https://www.fdic.gov/system/files/2024-07/ccbc-165-2207.pdf. This statement does nothing more than identify CCBC as the parent company of its subsidiaries, including CCB Asia, and contains no allegations or evidence regarding CCBC's control over CCB Asia or its employees. Therefore, Plaintiffs have failed to allege and employer-employee relationship between CCBC/CCBNY and Lam.

2. Apparent Authority

To sufficiently allege apparent authority, a plaintiff "must establish two facts: (1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the [plaintiff] reasonably relied on the representations of the agent." Herbert Const.

Co. v. Cont'l Ins. Co., 931 F.2d 989, 993-994 (2d Cir. 1991) (internal quotation and citations omitted).

The first prong requires a plaintiff to demonstrate "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into the transaction." Hallock v. State, 474 N.E.2d 1178, 1181 (N.Y. 1984). "Apparent authority, clearly, requires 'a factual showing that the [plaintiff] relied upon the misrepresentations of the agent because of some misleading conduct on the part of the *principal* – not the agent.'" F.D.I.C. v. United General Title Ins. Co., 11 Civ. 4610, 2014 WL 3611835, at *3 (E.D.N.Y. July 3, 2014) (quoting Herbert Const. Co. v. Const'l Ins. Co., 931 F.2d 989, 993 (2d Cir. 1991)).

Here, the FAC fails to allege facts that support a reasonable inference that CCBC/CCBNY's conduct created the appearance that Lam had authority to issue the LOCs. Plaintiffs argue that CCBC granted Lam with apparent authority by appointing him as "Relationship Manager," giving him an official "CCB" email address, and granting him access to "CCB" mail services, the CCBNY letterhead, and CCBC's corporate seal and stamp. (See Pls.' Opp'n to CCBC & CCBNY at 22; see also FAC ¶¶ 57, 59, 65-66, 96-97, 124.) Plaintiffs also maintain that the job description of Relationship

29

Manager cloaked Lam with apparent authority to issue the LOCs. As already discussed in Section III.B, Plaintiffs have failed to allege that Lam was an employee of CCBC. As such, his job title and description cannot be attributed to any manifestations of CCBC/CCBNY.

Even if Plaintiffs had adequately alleged that Lam was an employee of CCBC, the Court is not persuaded that Lam's job title and description cloaked Lam with apparent authority to issue LOCs in reinsurance transactions. The publicly posted job responsibilities of Relationship Manager include providing a "full range of wealth management products and services in order to increase Investment and Insurance penetration" and to "make recommendations for credit approval." (See FAC ¶ 91.) These vague descriptions and responsibilities do not support the inference that Relationship Managers are authorized to issue binding instruments such as LOCs in complex reinsurance transactions. Plaintiffs do not otherwise allege any facts suggesting that it was "common practice and custom" for bank employees in Lam's position to issue binding LOCs in reinsurance transactions. See Star Funding, Inc. v. Tire Centers, LLC, 717 Fed. App'x 38, 42 (2d Cir. 2017).

Regarding Lam's access to CCBNY letterhead, the red CCBC corporate stamp, and the forged Yingde signature, the FAC

does not sufficiently allege that CCBC/CCBNY granted said access to Lam. "Because the existence of a principal/agent relationship and the creation of apparent authority depend crucially on the words or actions *of the principal* to state a claim sufficient as a matter of law," Plaintiffs must allege some action on the part of CCBC/CCBNY from which Lam's agency may be inferred. Adams v. Labaton, Sucharow & Rudoff LLP, No. 07 Civ. 7017, 2009 WL 928143, at *4 (S.D.N.Y. Mar. 20, 2009). The FAC alleges no such conduct – Plaintiffs plead no facts suggesting that CCBC or CCBNY took any action to authorize or permit Lam's use of the letterhead or corporate stamp.

Plaintiffs cite F.D.I.C. v. United General Title Ins. Co., No. 11 Civ. 4610, 2014 WL 3611835 (E.D.N.Y. July 3, 2014), for the proposition that an agent's access to official, signed documents containing a corporate seal can suffice to show conduct by the principal creating the appearance of authority. (See Pls.' Opp'n to CCBC/CCBNY at 18.) In that case, in addition to pleading that the alleged principal granted the alleged agent access to the principal's official documents, the plaintiff also alleged that the agent at one point was an "authorized title agent of [the principal] pursuant to a title insurance issuing agreement." F.D.I.C., 2014 WL 3611835 at *1.

Moreover, accepting Plaintiffs' argument that access to documents alone is sufficient to plead apparent authority would effectively eliminate the requirement to plead facts showing that the principal's own conduct created the appearance of authority. But as the Second Circuit has made clear, "apparent authority is created only by the representations of the principal to the third party," and "an agent can[not] create apparent authority by his own actions or representations." Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989) (citing Trustees of UIU Health & Welfare Fund. v. New York Flame Proofing Co., 828 F.2d 79, 84 (2d Cir. 1987), Karavos Compania Naviera S.A. v. Altantica Export Corp., 588 F.2d 1, 10 (2d Cir. 1978)). The facts in the FAC only allege that Lam somehow gained access to the corporate stamp and forged signature but fails to allege any conduct by CCBC/CCBNY from which Lam's authority to use the stamp and signature can be inferred. A principal is only bound by acts the principal authorized – not by an agent's unauthorized use of corporate indicia to falsely represent authority. See Herbert, 931 F.2d at 993 (where "the agent stole a principal's indicia of authority and falsely represented to a third party that he had authority to bind the principal," the principal would not be liable to the third party).

32

Accordingly, CCBC/CCBNY cannot be held liable for fraud on an apparent authority theory.

### 3. *Respondeat Superior* Liability

Plaintiffs' attempt to hold CCBC/CCBNY liable under a *respondeat superior* theory similarly fails. Under New York law, "an employer may be held liable for the tortious acts of an employee committed within the scope of his employment." Abdelhamid v. Altria Grp., Inc., 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007); see also Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) ("It is black-letter agency law in New York that an employer is liable for the representations of its agents when those representations are made within the scope of the agent's employment.") (citing 2A N.Y. Jur.2d Agency & Indep. Contractors § 290 (2007)). "The key element of *respondeat superior* . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable." Abdelhamid, 515 F. Supp. 2d at 398. "'The determination of whether an employer-employee relationship exists turns on whether the alleged employer exercises control over the results produced, or the means used to achieve the results. De Sole v. Knowdler Gallery, LLC, 137 F. Supp. 3d 387, 417 (S.D.N.Y. 2015) (quoting Chuchuca v. Chuchuca, 890 N.Y.S.2d 573, 575 (App. Div. 2d Dep't 2009)).

As discussed, Plaintiffs fail to allege that Lam was employed by CCBC or that CCBC otherwise controlled Lam's ability to issue LOCs. Absent these allegations, Plaintiffs cannot hold CCBC vicariously liable for fraud on a *respondeat superior* theory. See De Sole, 137 F. Supp. 3d at 417 (dismissing fraud claims against a parent company because "the doctrine of *respondeat superior* does not render a parent company liable for the conduct of a subsidiary").

Accordingly, CCBC/CCBNY's Motion to Dismiss Plaintiffs' claim for fraud (Count I) against CCBC/CCBNY is **GRANTED,** and Count I as alleged against CCBC/CCBNY is **DISMISSED** without prejudice.

D. Negligent Supervision Claim Against CCBC/CCBNY

Plaintiffs contend that CCBC/CCBNY are liable for injuries resulting from Lam's conduct in perpetuating the fraud under a theory of negligent supervision. To state a claim for negligent supervision under New York law, in addition to the standard elements of negligence, a plaintiff must show "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the

employer's premises or with the employer's chattels." <u>Ehrens
v. Lutheran Church</u>, 385 F.3d 232 (2d Cir. 2004) (cleaned up).
Because Plaintiffs have failed to allege an employee-employer
relationship between Lam and CCBC/CCBNY, their claim for
negligent supervision must be dismissed.

Accordingly, CCBC/CCBNY's Motion to dismiss Plaintiffs'
claim for negligent supervision (Count II) against CCBC/CCBNY
is **GRANTED**. Accordingly, Count II as alleged against
CCBC/CCBNY is **DISMISSED** without prejudice.

E. <u>Negligence Claim Against CCBC/CCBNY</u>

For similar reasons, Plaintiffs' also fail to state a
claim for negligence against CCBC/CCBNY. To establish a prima
facie case of negligence under New York law, "a plaintiff
must demonstrate (1) a duty owed by the defendant to the
plaintiff, (2) a breach thereof, and (3) injury proximately
resulting therefrom." <u>Solomon ex rel. Solomon v. City of New
York</u>, 489 N.E.2d 1294, 1294 (N.Y. 1985).

The parties' briefing on Plaintiffs' negligence claim
only focuses on whether CCBC/CCBNY owed any duty to non-
customers of the bank, as HOA was not CCBC/CCBNY's customer.
(<u>See</u> CCBC & CCBNY Mem. at 32-33; Pls.' Opp'n at 32-33; CCBC
& CCBNY Reply at 15-16.) However, absent allegations that Lam
was either an employee of CCBC/CCBNY or that CCBC/CCBNY
otherwise had control of Lam's conduct, it is unclear to this

35

Court what duty CCBC/CCNY breached. "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court." Arango v. Vasquez, 933 N.Y.S.2d 82, 83 (App Div. 2d Dep't 2011). In making that determination, "the court must consider the reasonable expectations of the parties and society generally because the scope of any duty of care varies with the foreseeability of the possible harm." Id. at 84. Plaintiffs fail to allege that CCBC/CCBNY was Lam's employer or had control over Lam's conduct. Absent such a relationship, CCBC/CCBNY had no duty to monitor or ensure that Lam was not committing fraud. See Davis v. South Nassau Communities Hosp., 46 N.E.3d 614, 618 (N.Y. 2015) ("A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm.")

Accordingly, Plaintiffs' claim for negligence (Count III) against CCBC/CCBNY is **DISMISSED** without prejudice.

*** 

In sum, CCBC/CCBNY's motion to dismiss is **GRANTED**. Plaintiffs' claims against CCBC/CCBNY are **DISMISSED**, without prejudice.

### IV.  CCB ASIA'S MOTION TO DISMISS

CCB Asia separately moves to dismiss Plaintiffs' claims for fraud, negligent supervision, and negligence on the grounds that (1) the Court lacks personal jurisdiction and (2) the FAC fails to state a claim for relief for each cause of action.

A. <u>Personal Jurisdiction</u>

Plaintiffs argue that the Court has personal jurisdiction over CCB Asia through Section 302(a)(1) and (3) of New York's long-arm statute. The Court addresses each in turn.

1. <u>N.Y. C.P.L.R. Section 302(a)(1)</u>

Plaintiffs assert that the Court has personal jurisdiction over CCB Asia under Section 302(a)(1), alleging that, through Lam, CCB Asia purposefully availed itself of New York's banking markets and regulatory regime by issuing fraudulent LOCs payable at CCBNY. (<u>See</u> FAC ¶ 31; Pls.' Opp'n to CCB Asia at 15.) For the reasons set forth below, the Court concludes that it lacks personal jurisdiction over CCB Asia under Section 302(a)(1) with respect to Plaintiffs' claims for fraud, negligent supervision, and negligence.

To exercise personal jurisdiction over a nondomiciliary under Section 302(a)(1), the defendant must have transacted business in New York, and the cause of action must arise from that transaction. <u>See</u> <u>Best Van Lines</u>, 490 F.3d at 246. A claim

arises from a particular business transaction "when there is some articulable nexus between the business transacted and the cause of action sued upon." <u>Sole Resort</u>, 450 F.3d at 103 (internal quotation and citation omitted).

Plaintiffs have not established that CCB Asia itself transacted business in New York giving rise to this action.[8] Instead, they argue that Lam's contacts with New York should be imputed to CCB Asia for purposes of personal jurisdiction. (<u>See</u> Pls.' Opp'n to CCB Asia at 16-17.) Section 302(a)(1) provides that "a court may exercise jurisdiction over any non-domiciliary . . . who in person or *through an agent* transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1) (emphasis added). To establish an agency relationship for jurisdictional purposes, Plaintiffs must show "that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." <u>Hau Yin To v. HSBC Holdings, PLC</u>, 700 Fed. App'x. 66, 68 (2d Cir. 2017) (citing <u>Grove</u>

---

[8] The FAC alleges that CCB Asia purposefully availed itself of New York law by initiating legal proceedings in the Southern District of New York. (<u>See</u> FAC ¶ 25.) That proceeding was a petition for discovery under 28 U.S.C. § 1782, seeking evidence for use in foreign litigation in Hong Kong and Italy concerning the recovery of loans made to foreign entities. <u>See In re China Constr. Bank (Asia) Corp. Ltd.</u>, No. 1:23-mc-00017(S.D.N.Y.). Plaintiffs' claims have nothing to do with the subject matter of that proceeding and they do not arise from CCB Asia's limited contact with New York. <u>See</u> <u>Licci</u>, 732 F.3d at 168-69.

Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981));
see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking
Grp. PLC, 22 F.4th 103, 122 (2d Cir. 2021) ("[A] defendant
can purposefully avail itself of a forum through the action
of a third party by directing its agents or distributors to
take action there"); Galagy v. Bulletin Co., Inc., 504 F.2d
1062, 1065 (2d Cir. 1974) (agent must act "at the request and
for the business purposes of" the principal). The question of
control turns on "the realities of the relationship" in
question rather than the formalities of agency law." Hau Yin
To, 700 F. App'x at 68 (quoting CutCo Indus., Inc. v.
Naughton, 806 F.2d 361, 366 (2d Cir. 1986)).

    The FAC fails to allege facts suggesting that Lam's
conduct was taken CCB Asia's knowledge and consent.
Plaintiffs argue that Lam's use of company email, mail
services, letterhead, and company offices permit an inference
that CCB Asia knew of Lam's conduct. (See Pls.' Opp'n to CCB
Asia at 17.) Plaintiffs also contend that Lam's promotion
during the pendency of the fraud permits an inference that
CCB Asia was aware of and consented to Lam's activities
directed toward New York. However, none of these allegations
support the inference that CCB Asia "requested the
performance" of the conduct that Lam directed to New York.
East N.Y. Sav. Bank v. Republic Reality Mortg. Corp., 402

N.Y.S.2d 639, 641 (App. Div. 2d Dep't 1978). At most, the allegations suggest a failure to supervise Lam, but none of the alleged facts imply that CCB Asia played an "active role" or was the "primary actor" in directing Lam's conduct toward New York. As such, Lam's actions cannot be imputed to CCB Asia for purposes of personal jurisdiction. See Zobay v. MTN Group Limited, 695 F. Supp. 3d 301, 330 (E.D.N.Y. 2023) (citing Spetner v. Palestine Inv. Bank, 70 F.4th 632, 640 (2d Cir. 2023)).

Because Plaintiffs have failed to allege that CCB Asia transacts business within New York, this Court cannot exercise jurisdiction over any of Plaintiffs' claims against CCB Asia pursuant to Section 302(a)(1). Moreover, because Plaintiffs' cannot impute Lam's conduct to CCB Asia for personal jurisdiction purposes, CCB Asia's Motion to Dismiss Plaintiffs' claim for fraud (Count I) against CCB Asia is **GRANTED**, and Count I as alleged against CCB Asia is **DISMISSED** without prejudice.

### 2. N.Y. C.P.L.R. Section 302(a)(3)

Plaintiffs next contend that N.Y. C.P.L.R. Section 302(a) "expressly allows for the exercise of personal jurisdiction over those who commit tortious acts through an agent." (Pls.' Opp'n to CCB Asia at 16.) Two provisions of Section 302(a) apply to torts committed through an agent:

Section 302(a)(2), which provides for jurisdiction where a defendant "commits a tortious act within the state," and Section 302(a)(3), which applies to torts committed outside the state that cause injury within New York. See N.Y. C.P.L.R. § 302(a)(2)-(3). Plaintiffs do not specify on which provision they rely. Regardless, the Court cannot exercise jurisdiction over Plaintiffs' fraud claim under Section 302(a) because Plaintiffs have not sufficiently alleged that Lam acted as an agent of CCB Asia when directing conduct toward New York. See Edwardo v. Roman Catholic Bishop of Providence, 66 F.4th 69, 74 (2d Cir. 2023).

Plaintiffs' negligence and negligent supervision claims do not rely on Lam's conduct because they seek recovery for CCB Asia's allegedly tortious conduct, rather than Lam's. Under Section 302(a)(3), a court may exercise personal jurisdiction over a nondomiciliary when (1) the nondomiciliary commits a tortious act outside of New York, (2) the cause of action arises from said tortious act, and (3) said tortious act caused injury to a person or property within New York. See Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP, 589 F. Supp. 3d 401, 413 (S.D.N.Y. 2022); see also N.Y. C.P.L.R. § 302(a)(3).[9] Section 302(a)(3) also

_____

[9] The Court cannot exercise personal jurisdiction under Section 302(a)(2) because "a negligent act that takes place outside of New York – such as negligent hiring – that causes an injury in the state does not confer

requires a showing that the defendant (1) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in New York, or (2) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y.C.P.L.R. § 302(a)(3)(i)-(ii). Plaintiffs fail to address or satisfy any of these prongs, either in the FAC or their opposition. Accordingly, Plaintiffs have not established a prima facie basis for personal jurisdiction over CCB Asia on their negligence-based claims. Nonetheless, as further discussed below, the Court believes that limited jurisdictional discovery is warranted under this prong.

### 3. Plaintiffs' Motion for Jurisdictional Discovery

Plaintiffs move for jurisdictional discovery in the event the Court finds that Plaintiffs have failed to establish personal jurisdiction. (See Dkt. No. 93.) "District courts have broad discretion to decide whether to allow jurisdictional discovery and, if so to what extent." In re MS Angeln GmbH & Co., No. 10 Civ. 820, 2012 WL 1080300, at *7 (S.D.N.Y. Mar. 29, 2012). A court may order jurisdictional

---

jurisdiction under [Section] 302(a)(2)." Reinhardt v. City of Buffalo, No. 21 Civ. 206, 2022 WL 2442300, at *7 (W.D.N.Y. July 5, 2022).

discovery where, "even if [a] plaintiff has not made a *prima facie* showing [of jurisdiction, it has] made a sufficient start toward establishing personal jurisdiction." City of Almaty v. Abylazov, 278 F. Sup. 3d 776, 809 (S.D.N.Y. 2017) (internal quotation marks omitted); see also Daventree Ltd. v. Republic of Azerbajan, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction.").

In support of their motion for jurisdictional discovery, Plaintiffs attach a Request for Production ("RFP"), which seeks documents from CCB Asia that are responsive to a variety of issues and questions. (See Dkt. No. 93-2, "RFP".)

In the Related Action, the Court granted jurisdictional discovery to the Incline Casualty Plaintiffs, who also asserted a negligent supervision claim against CCB Asia and made more detailed allegations regarding personal jurisdiction under Section 302(a)(3)(ii). In the Related Action, the Incline Casualty Plaintiffs made a sufficient showing that CCB Asia committed a tort outside of New York, from which the cause of action arose and that caused injury to a person or property within New York. However, the Incline

43

Casualty Plaintiffs failed to make a sufficient showing that CCB Asia satisfies the requirement that it derives substantial revenue from interstate or international commerce such that it should reasonably expect the act to have consequences in New York. Accordingly, this Court granted limited jurisdictional discovery on that narrow issue.

Here, however, the scope of the discovery Plaintiffs seek is overly broad. The RFP, for example, seeks "all documents and communications relating to CCB Asia's knowledge or awareness of letters of credit issued on CCBNY letterhead by branches entities, offices, or other locations other than CCBNY." (Id. at 11.) It also seeks "[a]ll documents and communications relating to any warning about or investigations into letters of credit issued on CCBNY letterhead by branches, entities, offices, or locations other than CCBNY." (Id.) "Requests for limited discovery to help establish components of jurisdiction should be denied where the discovery 'goes as much to the heart of [the] plaintiff'[s] claims on the merits as it does the jurisdictional issues.'" Doe 1 v. Congregation of the Sacred Hearts of Jesus & Mary, No. 21 Civ. 6865 (VSB), 2022 WL 2901403, at *3 (S.D.N.Y. July 22, 2022). Plaintiffs' discovery requests, at minimum, go to the heart of their negligent supervision claim, an element of which is CCB Asia's

44

knowledge of Lam's propensity to issue fraudulent letters of credit. Accordingly, the Court will not permit Plaintiffs to pursue its document requests against CCB Asia.

However, the Court is mindful that the facts in the Related Action substantially overlap with the facts here, including facts relevant to personal jurisdiction. As in the Related Action, the alleged tortious conduct here is CCB Asia's negligent retention and supervision of its purported employee, Lam. The injury occurred in New York when CCBNY declined to honor Plaintiffs' sight drafts, resulting in the loss of reinsurance coverage. See United Bank of Kuwait, PLC v. James M Bridges, Ltd., 766 F. Supp. 113, 116 (S.D.N.Y. 1991) ("New York courts uniformly hold that the situs of a nonphysical, commercial injury is 'where the critical events associated with the dispute took place.'") (citing American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 433 (2d Cir. 1971)).

As this is a consolidated action with substantial factual overlap between the two sets of plaintiffs and the common issues as to CCB Asia's contacts with New York, the Court will permit limited jurisdictional discovery in this action as well, notwithstanding the thinner jurisdictional allegations in the FAC. Given that these cases are consolidated for pretrial purposes, allowing limited

jurisdictional discovery promotes efficiency and ensures a consistent and fair development of the jurisdictional record across this consolidated action.[10]

Accordingly, the Court will permit limited jurisdictional discovery on the narrow issue of CCB Asia's revenue sources under Section 302(a)(3)(i) and (ii). See Allojet PLC v. Vantgage Assocs., No. 04 Civ. 05223, 2005 WL 612848, at *7 (S.D.N.Y. March 15, 2005). The scope of this discovery is limited only to the question of whether CCB Asia "derives substantial revenue" either from New York or from interstate or international commerce such that it should expect consequences in New York. Moreover, should the Court ultimately find that personal jurisdiction exists under Section 302(a)(3)(ii), that jurisdiction would extend only to Plaintiffs' claims for negligent supervision and negligence, for the reasons previously stated and because the scope of

---

[10] Plaintiffs recently notified the Court of jurisdictional facts discovered in a separate proceeding against the Defendants. (See Dkt. No. 113 at 1.) In White Rock Ins. (SAC) Ltd. v. China Constr. Bank Corp., No. 654432/2024 (N.Y. Comm. Div. June 25, 2025). Plaintiffs claim that a disclosed document shows that Yu Po Holdings maintained a bank account with CCB Asia and "received deposits to that bank account through Bank of America in New York." (See Dkt. No. 113 at 2.)

The Court declines to expand the scope of jurisdictional discovery based on this evidence. The mere "use of funds flowing from a New York bank account to a separate, foreign bank account" does not constitute transacting business under Section 302(a)(1). Timothy v. Coffey Nursery Landscape, Inc. v. Soave, 760 F. App'x 58, 60 (2d Cir. 2019) (citing Licci, 984 N.E.2d at 900). The evidence Plaintiffs have submitted falls short of providing a sufficient basis to suggest that CCB Asia transacts business in New York so as to justify an expansion of jurisdictional discovery beyond the scope set forth in this order.

jurisdictional discovery should not encompass Lam's conduct or relationship with CCB Asia and/or CCBC/CCBNY.

**V.    ORDER**

For the preceding reasons, it is hereby

**ORDERED** that the motion (Dkt. No. 91) of Defendants China Construction Bank Corporation and China Construction Bank New York to dismiss all claims against them in the First Amended Complaint (Dkt. No. 55) of Plaintiffs Homeowners of America Holding Corporation, Porch.com, Inc., and Porch Group (collectively, "Plaintiffs") is **GRANTED**; it is further

**ORDERED** that the motion (Dkt. No. 75) of Defendant China Construction Bank Corporation (Asia) to dismiss all claims against it in the First Amended Complaint is **GRANTED** with respect to Count I, and **DENIED** with respect to Counts II and III; it is further

**ORDERED** that the letter motion (Dkt. No. 93) of Plaintiffs seeking jurisdictional discovery is **DENIED**; it is further

**ORDERED** that all remaining pretrial matters, including jurisdictional discovery and any motions for leave to amend, will be referred by separate order to the assigned Magistrate Judge for supervision and case management.

The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 75, 91, and 93.

**SO ORDERED.**

Dated:    6 August 2025
          New York, New York

_____
          Victor Marrero
            U.S.D.J.