UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___8/6/2025
```

IN RE CHINA CONSTRUCTION BANK CORP.

This Document Relates To:

INCLINE CASUALTY COMPANY and REDPOINT
COUNTY MUTUAL INSURANCE COMPANY,

                              Plaintiffs,

            - against -

CHINA CONSTRUCTION BANK CORPORATION,
CHINA CONSTRUCTION BANK (ASIA)
CORPORATION LIMITED, and CHINA
CONSTRUCTION BANK NEW YORK BRANCH,

                              Defendants.

24 Civ. 3591 (VM)

DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Incline Casualty Company ("Incline") and Redpoint County Mutual Insurance Company ("Redpoint") (collectively, "Plaintiffs") bring this action against China Construction Bank Corporation ("CCBC"), China Construction Bank (Asia) Limited ("CCB Asia"), and China Construction Bank New York Branch ("CCBNY") (collectively, "Defendants"). In their First Amended Complaint, (Dkt. No. 47, "FAC"), Plaintiffs allege that Defendants failed to honor letters of credit ("LOCs") they issued to Plaintiffs, thereby denying Plaintiffs access to reinsurance funds to cover Plaintiffs' insurance risk obligations. Plaintiffs assert claims for (1) breach of contract against CCBC and CCBNY (Counts I & II); (2) fraud,

in the alternative, against CCBC and CCB Asia (Counts III & IV); (3) negligent supervision against CCBC and CCB Asia (Counts V & VI); (4) violations of Uniform Commercial Code ("UCC") § 5-108 against CCBC and CCBNY (Count VII & VIII); and (5) declaratory judgment against CCBC (Count IX). (See FAC ¶¶ 103-166.)

Defendants CCBC and CCBNY jointly move to dismiss the claims against them under Federal Rules of Civil Procedure ("Rule") 12(b)(2) and 12(b)(6), arguing that Plaintiffs fail to establish personal jurisdiction over their claims and also fail to state a claim for relief. (See "CCBC & CCBNY Mot.," Dkt. No. 92.) Defendant CCB Asia separately moves to dismiss on the same grounds. (See "CCB Asia Mot.," Dkt. No. 78.) For the reasons stated below, CCBC/CCBNY's Motion is **GRANTED**, and CCB Asia's Motion is **DENIED**.

## I.    BACKGROUND

A. Factual Background[1]

1. The Parties

---

[1] The following facts are taken from Plaintiffs' FAC, which the Court must accept as true for purposes of resolving Defendants' respective motions to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 490 (S.D.N.Y. 2013). In reviewing Defendants' motions, the Court may consider all documents that Plaintiffs attached to the pleadings, referenced in the FAC, and have in their possession, as well as documents of which Plaintiffs' had knowledge, and upon which Plaintiffs' relied in drafting the complaint asserting this action. See Chambers v. Time Warner, Inc., 282 F.3d 147 153 (2d Cir. 2002). The Court may also consider matters of which judicial notice may be taken. See id.

Incline is an insurance company with its principal place of business located in Austin, Texas. (See FAC ¶ 10.) Redpoint is a county mutual insurance company with its principal place of business also located in Austin, Texas. (See id. ¶ 11.)

CCBC is a foreign bank headquartered in Beijing, China. (See id. ¶ 12.) CCBC conducts business in New York through its New York branch office, CCBNY. (See id. ¶¶ 13, 17.) CCBNY is directly controlled and managed by the President of CCBC. (See id. ¶ 13.) CCBC (through CCBNY) is licensed with and regulated by the New York State Department of Financial Services and the Federal Reserve (see id. ¶ 19.) and is also listed by the National Association of Insurance Commissioners ("NAIC") as a qualified U.S. financial institution authorized to issue LOCs as collateral in reinsurance arrangements. (See id. ¶¶ 19, 20.)

CCB Asia, a wholly owned subsidiary of CCBC, is located in Hong Kong, S.A.R., China. CCBNY maintains a correspondent account with CCB Asia. (See id. ¶ 14.) In addition, CCBC routinely issues public statements on behalf of all of its subsidiaries and branches, including CCBNY and CCB Asia, which operate as a "single entity." (See id. ¶ 15.)

2. The Reinsurance Arrangement

In a reinsurance transaction, an insurance company (the "cedent") transfers a portion of the risk from specific

policies it underwrites to another insurer (the "reinsurer"), effectively sharing or shifting part of the risk. (See id. ¶ 37.) The reinsurer takes on some of the financial risk and, in return, receives a share of the premiums from the underlying insurance policies. (See id. ¶ 38.) This risk transfer allows the cedent to reduce the financial reserves needed to protect policy holders, thereby increasing its ability to underwrite more insurance. (See id.)

If a reinsurer is not licensed in the state of Texas, the reinsurer is legally and contractually required to collateralize its obligations to its cedent. (See id. ¶ 40.) A common way of collateralizing a reinsurance obligation is providing a clean, irrevocable, unconditional, LOC issued by a qualified financial institution. (See id.) The LOC must be a cash equivalent of the reinsurance obligation so that the cedent has the liquidity to pay out claims and remain solvent. (See id.) If a non-licensed reinsurer fails to provide compliant collateral, the cedent must treat the uncollateralized reinsured liabilities as its own, resulting in a financial loss even before any claims are paid. (See id. ¶ 41.)

In 2020, The Corinthian Group ("Corinthian"), Osprey Re, Osprey Re Vescor IPC LLC, Vescor LLC, and Proventus Holdings, LP (collectively, the "Transaction Entities") formed

segregated account reinsurers: Corinthian Re SPC, Osprey Re, and Coastal Insurance SPC (collectively, the "Corinthian Reinsurers"). (See id. ¶¶ 42-43.) The Transaction Entities partnered with Vesttoo Ltd. ("Vesttoo," together with the Corinthian Reinsurers and Transaction Entities, "Intermediaries") to create a reinsurance structure. (See id. ¶ 45.) This structure was developed in part through meetings held at Vesttoo's New York offices, where Intermediary executives regularly met with Vesttoo personnel. (See id. ¶ 64.)

In 2021 and 2022, the Transaction Entities solicited Plaintiffs to enter into reinsurance agreements (the "Reinsurance Contracts") with the Corinthian Reinsurers. Under those contracts, the Corinthian Reinsurers assumed a portion of Plaintiffs' risk in exchange for reinsurance premiums. (See id. ¶ 45.) The Corinthian Reinsurers were not licensed in Texas, where Plaintiffs are domiciled, and were thus required to collateralize their reinsurance obligations. (See id. ¶ 2.) In late 2021, Corinthian informed Plaintiffs that Defendants would be providing the required collateral under the Reinsurance Contracts. (See id. ¶ 46.)

As part of its due diligence in evaluating Defendants as reliable LOC issuers, Corinthian conducted global anti-money laundering checks on CCBC, communicated with CCBC personnel,

verified LOC issuance and cancellation instructions, and engaged independent auditors to confirm the LOCs' authenticity. (See id. ¶ 59.) In addition, Chun-Yin Lam ("Lam"), a Relationship Manager at "CCB," confirmed all the LOCs at issue, including by means of emails dated June 7, 2022, May 8, 2023, May 23, 2023, and June 12, 2023. (See id. ¶ 61.) As Relationship Manager, Lam's official job description included "expanding premier segment by acquiring new customers or upgrade existing high net worth customers," "providing full range of wealth management products and services in order to increase Investment and Insurance penetration," and "promoting full range of banking and wealth management products and services." (Id. ¶ 86 (alterations omitted).) Lam and other employees of Defendants used CCBC resources and contracts, including CCBNY's offices, to hold meetings with the Intermediaries. Lam also hosted meetings with the Intermediaries in CCB Asia's office in Hong Kong. (See id. ¶ 89.)

Acting on behalf of the Corinthian Reinsurers, the Transaction Entities procured fifteen LOCs from Defendants. (See id. ¶¶ 47-48.) Each LOC appeared to be signed by a CCBC executive and bore a CCBC stamp. (See "Ex. 1," Dkt. No. 47-1.) Seven LOCs named Incline as beneficiary and eight named Redpoint. (See FAC ¶ 48.) Each LOC stated that it was payable

at CCBNY, listed CCBNY's New York address, and promised to promptly honor Plaintiffs' sight drafts upon presentation at that location. (See id.) One of the LOCs appeared to be issued directly from CCBNY (see Ex. 1 at 2), while the remaining LOCs were issued from CCBC's Shanghai Branch. (See Ex. 1 at 4-31.) Each LOC was sent to the applicable Corinthian Reinsurers and the Corinthian Reinsurers delivered the LOCs to Plaintiffs. (See FAC ¶¶ 50-51.) Each LOC established a clean, irrevocable, and unconditional standby letter of credit in the applicant's favor for drawings up to a certain amount in U.S. dollars. (See FAC ¶ 42; see generally Ex. 1.) Without such LOCs, Plaintiffs would be unable to take reinsurance credit on their financial statements. (See FAC ¶ 53.)

    3. <u>Defendants' Failure to Honor the LOCs</u>

In April 2022, a non-party insurance company contacted CCBNY by email regarding certain LOCs procured by Lam. (See id. ¶ 96.) CCBNY provided contact information for CCB Asia, where Lam was employed, and informed the non-party that the letters were issued by CCB Asia, rather than the New York branch. CCBNY instructed the non-party to contact CCB Asia directly. (See id. ¶ 97.)

In July 2023, after hearing reports of issues with certain other LOCs issued by CCBC, Plaintiffs asked

Corinthian to provide contact information for Defendants' representatives. (See id. ¶ 71.) William Cheney of Vesttoo responded by forwarding Lam's email (chun-yin.lam@asia.ccb.com) and phone number. (See id.) Plaintiffs emailed Lam seeking confirmation of the LOCs' authenticity but received no response and no bounce-back email, suggesting that the email address remained valid. (See id. ¶¶ 72, 74-75.) Plaintiffs then contacted Defendants' counsel, Sullivan & Cromwell LLP ("S&C"), for confirmation. (See id. ¶ 78.) In response, Shari Leventhal of S&C sent a letter (the "S&C Letter") to Plaintiffs' counsel stating that CCBNY concluded it did not issue any of the LOCs. (See id. ¶ 79.)

On July 24, 2023, Plaintiffs asked Corinthian to confirm that each LOC had been independently verified by both Corinthian and its auditors. (See id. ¶ 80.) In response, Sergio Micucci ("Micucci"), a director at Corinthian, emailed Plaintiffs' counsel stating that CCBC had been cleared through standard global anti-money laundering checks with no red flags. (See id. ¶ 81.) Micucci also noted that, during Corinthian's 2021 and 2022 audits, Vesttoo provided a contact who purportedly confirmed the LOCs to both Corinthian and its external auditors. (See id.) Micucci further stated that the CCBC representative used a "legitimate bank email" and that Corinthian personnel had directly corresponded with the

"Relationship Manager" to confirm LOC issuance and cancellation instructions. (See id.)

Subsequently, Plaintiffs presented sight drafts for each LOC at CCBNY's office. (See id. ¶ 82-83.) In response, counsel at S&C referred Plaintiffs to the S&C Letter, which stated that CCBNY did not issue the LOCs. (See id. ¶ 84.)

## B. Procedural Background

Plaintiffs filed this action in New York State Supreme Court, New York County (the "State Court") on April 22, 2024, against both the instant Defendants and the Transaction Entities.[2] On June 3, 2024, Plaintiffs and the Transaction Entities filed a stipulation of discontinuance without prejudice in State Court, leaving the current Defendants as the only defendants in this case. (See Dkt. No. 1-1.) Defendants filed a Notice of Removal on June 7, 2024, based on diversity jurisdiction, 28 U.S.C. § 1446. (See Dkt. No. 1.)[3]

After the parties exchanged pre-motion letters pursuant to the Court's Individual Practices in anticipation of

---

[2] See, Dkt. No. 1 at 4, Incline Casualty Co. et al. v. China Construction Bank Corp. et al., No. 24 Civ. 4392 (S.D.N.Y. June 6, 2024).

[3] A month before the instant action was filed, another lawsuit was commenced against Defendants in this Court. (See Homeowners of Am. Ins. Co. v. China Constr. Bank Corp., No. 24-cv-3591, Dkt. No. 1 (the "Related Action").) Plaintiffs in the Related Action make similar allegations and assert similar claims against Defendants. On August 7, 2024, on consent of all parties, the Court consolidated the instant action and the Related Action for pretrial purposes. (See Dkt. No. 36.)

Defendants' motions to dismiss, Plaintiffs filed the First Amended Complaint on September 9, 2024. (See FAC.) The FAC alleges first and foremost that Defendants breached their obligation under the LOCs to provide collateral to Plaintiffs and further alleges that Defendants are using Lam as a scapegoat to avoid its contractual obligations. Plaintiffs assert claims for (1) breach of contract against CCBC and CCBNY; (2) fraud, in the alternative, against CCBC and CCB Asia; (3) negligent supervision against CCBC and CCB Asia; (4) violations of UCC § 5-108 against CCBC and CCBNY; and (5) declaratory judgment against CCBC. (See FAC ¶¶ 103-166.)

After Plaintiffs filed the FAC, the parties again exchanged pre-motion letters pursuant to the Court's Individual Practices in anticipation of Defendants' motion to dismiss. (See Dkt. Nos. 57, 60, 64.) CCBC and CCBNY jointly filed a motion to dismiss, while CCB Asia filed a separate motion to dismiss, both under Rule 12(b)(2) and 12(b)(6), accompanied by supporting memoranda of law. (See "CCBC & CCBNY Mem.," Dkt. No. 86; "CCB Asia Mem.," Dkt. No. 84.) Plaintiffs jointly filed oppositions to both motions (see "Pls.' Opp'n. to CCBC & CCBNY," Dkt. No. 101; "Pls.' Opp'n to CCB Asia," Dkt. No 100), and Defendants filed replies. (See "CCBC & CCBNY Reply," Dkt. No. 107; "CCB Asia Reply," Dkt. No. 106.)

## II.  <u>STANDARD OF REVIEW</u>

A. <u>Rule 12(b)(2) – Lack of Personal Jurisdiction</u>

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of showing that the court maintains jurisdiction over the defendant. <u>See</u> <u>In re Magnetic Audiotape Antitrust Litig.</u>, 334 F.3d 204, 206 (2d Cir. 2003). However, "prior to discovery, a plaintiff challenged by a jurisdiction-testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." <u>Jazini v. Nissan Motor Co.</u>, 148 F.3d 181, 184 (2d Cir. 1998 (internal quotation marks omitted)). "[A] prima facie showing of jurisdiction does not mean that [the] plaintiff must show only some evidence that [the] defendant is subject to jurisdiction; it means that [the] plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." <u>Bellepoint, Inc. v. Kohl's Dep't Stores, Inc.</u>, 975 F. Supp. 562, 564 (S.D.N.Y. 1997). A plaintiff may "make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant." <u>Whitaker v. Am. Telecasting, Inc.</u>, 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks omitted).

When evaluating a motion to dismiss for lack of personal jurisdiction, courts "may consider materials outside the pleadings, including affidavits and other written materials." Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015). Pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. See Whitaker, 261 F.3d at 208. "However, conclusory allegations are not enough to establish personal jurisdiction." Gmurzynska v. Hutton, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (internal quotation marks omitted); see also Yellow Page Sols, Inc. v. Bell Atl. Yellow Pages Co., No. 00 Civ. 5663, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) ("The plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be factually supported." (internal citations and quotation marks omitted)).

B. Rule 12(b)(6) – Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal'

conduct" — there is not "a probability requirement at the pleading stage." Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (quoting Twombly, 550 U.S. at 556); see Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" Liboy v. Russ, No. 22 Civ. 10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting Twombly, 550 U.S. at 555).

In reviewing a motion to dismiss under Rule 12(b)(6), the district court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). The district court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." Garcia v. Lewis, No. 05 Civ. 1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005).

### III. CCBC/CCBNY's MOTION TO DISMISS

CCBC/CCBNY[4] argue that the FAC should be dismissed because: (1) Plaintiffs have failed to establish that the Court may exercise personal jurisdiction over CCBC/CCBNY and (2) the FAC fails to state a claim against CCBC/CCBNY. The Court addresses each argument in turn.

### A. Personal Jurisdiction

The Court starts, as it must, with personal jurisdiction. See Romero v. 88 Acres Foods, Inc., 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022). In diversity cases, personal jurisdiction over a non-domiciliary defendant is determined by reference to the law of the state in which the court sits. See Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997); see also Hoofritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985) (in federal diversity cases, personal jurisdiction is determined by "the law of the forum in which the federal court sits"). Thus, the Court will assess diversity jurisdiction according to New York law.

Plaintiffs advance four grounds supporting this Court's exercise of personal jurisdiction over CCBC/CCBNY. First, they allege that CCBC/CCBNY consented to personal

---

[4] CCBC and CCBNY are treated as the same entity. See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 51 (2d Cir. 2012) (holding that where a New York branch of a foreign bank "is not separately incorporated, [it] has no legal identity separate from [the parent bank]".) Accordingly, the Court addresses the claims against CCBC and CCBNY together.

jurisdiction by agreeing to the forum-selection clause contained in their application for inclusion on the NAIC List. Second, Plaintiffs claim that CCBC/CCBNY consented to specific personal jurisdiction based on the choice-of-law provision in the fifteen LOCs issued to Plaintiffs. Third, according to Plaintiffs the Court has personal jurisdiction over CCBC/CCBNY pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1603, 1605. And fourth, Plaintiffs further argue that CCBC/CCBNY's business activities in New York bring them within the reach of New York's long-arm statute. The Court is persuaded that New York's long-arm statute reaches the alleged conduct. Thus the Court need not consider Plaintiffs' remaining arguments relating to personal jurisdiction. See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp., 397 F. Supp. 3d 323, 332 n.2 (S.D.N.Y. 2019).

    1. N.Y. C.P.L.R. § 302(a)(1)

    New York Civil Practice Law and Rules Section 302(a)(1) ("Section 302(a)(1)") allows a court to "exercise personal jurisdiction over any non-domiciliary" who "transacts any business within the state or contracts anywhere to supply goods or services in the state" as long as the cause of action arises from the transaction or contract. N.Y. C.P.L.R. §

302(a)(1). "To determine the existence of jurisdiction under Section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (quoting Deutsche Bank Sec., Inc. v. Montana Bd. Of Invs., 850 N.E.2d 1140, 1142 (N.Y. 2006)). Moreover, a plaintiff "must establish personal jurisdiction with respect to each claim asserted." Weiss v. National Westminster Bank PLC, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016) (citing Sunward Elecs., Inc. v. McDonald, 362 F. 3d 17, 24 (2d Cir. 2004)).

A claim arises from a particular business transaction "when there is some articulable nexus between the business transacted and the cause of action sued upon." Sole Resort, S.A. De C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotation marks omitted). There must be a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Licci ex rel. Licci v. Lebanese Can. Bank, SAL, 732 F.3d 161, 168-69 (2d Cir. 2013) (internal quotation marks omitted). "[W]here at least one element [of plaintiff's claim] arises from New York contacts," there is personal

16

jurisdiction under Section 302(a)(3). Id. at 169 (internal quotation marks omitted).

Applying the preceding standard, the Court will exercise personal jurisdiction over each of Plaintiffs' claims against CCBC/CCBNY pursuant to Section 302(a)(1). First, Plaintiffs' breach of contract claim arises from CCBC/CCBNY's contacts with New York. "[T]he test for transacting business under 302(a)(1) in contract actions can be somewhat imprecise." Premier Lending Servs., Inc. v. J.L.J. Assocs., 924 F. Supp. 13, 15 (S.D.N.Y. 1996). Courts have developed certain considerations in deciding whether personal jurisdiction over a breach of contract action, such as whether the contract was negotiated or executed in New York or whether the course of dealings among the contracting parties occurred in New York. See Sunward Elecs, 362 F.3d at 22-23. Ultimately, the determination is based on the totality of the circumstances. Id.

While the FAC does not contain specific allegations regarding whether the Reinsurance Contract at issue was negotiated in New York, "the statutory test may be satisfied by a showing of other purposeful acts performed by [defendants] in this State in relation to the contract, albeit preliminary or subsequent to its execution." Wilson v. Dantas, 9 N.Y.S.3d 187, 183 (App. Div. 1st Dep't 2015). Here,

CCBC, through CCBNY, applied to be listed on the NAIC List, which certified the entities as issuers of letters of credit for reinsurance collateral. (See FAC ¶ 20.)

The Court is persuaded that Defendants' opening a branch financial institution in New York and placing that entity on the NAIC List constitutes a volitional transaction of business in New York done for purposes of negotiating and executing contracts related to LOCs in reinsurance transactions, including the instant one. Furthermore, there is a "substantial relationship between the business transaction and the claim asserted" because, as the FAC alleges, Plaintiffs would not and, under Texas law, could not have entered into the Reinsurance Arrangements with the Intermediaries if CCBC was not on the NAIC List. (See FAC ¶¶ 40, 53.) Given the "relatively permissive" inquiry under Section 301(a)(2), the Court is satisfied that CCBNY's application on behalf of CCBC seeking placement on the NAIC list is more than sufficient to support the Court's exercise of personal jurisdiction over Plaintiffs' breach of contract claim pursuant to New York's long arm statute. See Wilson, 9 N.Y.S.3d at 184.

For the same reason, the Court will exercise personal jurisdiction over Plaintiffs' fraud claim. The FAC alleges that Plaintiffs had, in part, relied on the LOCs purportedly

signed by an employee of CCBC because CCBC listed its New York branch as a NAIC-approved issuer of LOCs. (See FAC ¶ 127.) Accordingly, CCBC/CCBNY's contacts with New York are not "completely unmoored" from Plaintiffs' claim for fraud. See Licci v. Lebanese Canadian Bank, 984 N.E.2d 893, 900-01 (N.Y. 2012) (the "arising from" prong of Section 302(a)(1) "connote[s], at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless" of the claim's ultimate merits.)

Finally, the Court will also exercise personal jurisdiction over Plaintiffs' negligent supervision claim against CCBC because that claim arises in part from the allegation that CCBNY had notice of several LOCs issued by Lam after receiving an inquiry from another non-party insurance company, and allegedly did not act on it. (See FAC ¶¶ 96-97.)[5]

For these reasons, the Court finds that it may exercise personal jurisdiction over Defendants CCCB and CCBNY. Accordingly, CCBC and CCBNY's motion to dismiss for lack of

---

[5] There is also personal jurisdiction over Plaintiffs' UCC claim against CCBC and CCBNY because that claim arises from CCBNY's refusal to honor the LOCs.

personal jurisdiction is **DENIED**. The Court now turns to the merits of the dispute at issue.

### B. Breach of Contract Claim Against CCBC/CCBNY

Plaintiffs assert that CCBC/CCBNY breached the LOCs when it refused to honor them. Under New York law, the elements of a breach of contract claim are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Richmond v. Montefiore Medical Center, 21 Civ. 8700, 2023 WL 6216271, at *15 (S.D.N.Y. Sept. 25, 2023). CCBC/CCBNY argue that Plaintiffs have not sufficiently alleged the existence of an agreement because (1) the LOCs bear forged signatures and (2) Lam lacked both actual and apparent authority to issue them. (See CCBC & CCBNY Mem. at 21–25.) The Court addresses each argument in turn.

#### 1. Existence of a Contract

Under New York law, a forged signature renders a contract void from the start. See Orlosky v. Empire Sec. Sys., Inc., 657 N.Y.S.2d 840, 842 (App. Div. 3d Dep't 1997). In support of their argument that the LOCs were forged, Defendants refer to filings in the Vesttoo bankruptcy proceeding ("Vesttoo Bankruptcy Action") that purportedly acknowledge that the LOCs issued in Vesttoo reinsurance transactions were

fraudulent.[6] (<u>See</u> CCBC & CCBNY Mem at 21; "DeCamp Decl., Ex.
1," Dkt. No. 87-1 at 11-15.) Specifically, Defendants refer
to the Debtor's First Interim Report ("Debtor's Report") (<u>see</u>
DeCamp Decl., Ex. 1), in which counsel for Vesttoo and its
affiliated debtors published preliminary results of its
investigation into Vesttoo's involvement with the issuance of
fraudulent LOCs generally. (<u>See</u> Decamp Decl., Ex. 1 at 10.)
The Debtor's Report concluded that "the LOCs that were the
foundation of Vesttoo's business were largely illusory" and
that most LOCs issued in Vesttoo's transactions were
fraudulent. (<u>See</u> Decamp Decl., Ex. 1 at 11.)

    This extrinsic evidence is insufficient for the Court to
conclude, as a matter of law at the motion to dismiss stage,
that the fifteen LOCs in question were forged. Although the
Debtor's Report suggests the LOCs underlying Vesstoo's
transactions generally were fraudulent, the Report does not
make any findings as to the specific LOCs issued to Plaintiffs
through Corinthian. Accordingly, it is premature for the
Court to determine the validity of the LOCs at this time.

        2. <u>Agency Theory</u>

---

[6] On August 14 and 15, 2023, Vesttoo and its affiliated debtors filed for
chapter 11 bankruptcy in the United States Bankruptcy Court for the
District of Delaware. <u>See</u> <u>In re: Vesttoo Ltd., et al.</u>, Case No. 23-11160
(Bankr. D. Del.).

The FAC asserts an agency theory of liability for the breach of contract claim. It alleges that "Lam was authorized by CCBC and/or [CCB Asia] to negotiate and issue letters of credit, including, without limitation, the LOCs." (See FAC ¶ 87.) In response, Defendants argue that Lam did not have actual or apparent authority to bind CCBC/CCBNY to the issued LOCs. Under New York law, "an agent must have authority, whether apparent, actual, or implied, to bind his principal" to a contract. Merrill Lynch Interfolding, Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998). "If the agent had authority to enter into the contract, the principal will be bound." Com. Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003). The Court will address in turn whether Plaintiffs have sufficiently demonstrated that Lam had actual authority and/or apparent authority to bind Defendants.

        i.  Actual Authority

To establish actual authority, Plaintiffs must allege "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." Comm. Union Ins., 347 F.3d at 462. Whether an agent had actual authority may be determined by "either express or implied . . . words and conduct [between the principal and the agent]

22

as construed in light of the surrounding circumstances." Cromer Fin. Ltd v. Berger, Nos. 00 Civ. 2284, 00 Civ. 2498, 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002) (quoting Riverside Rsch. Inst. v. KMGA, Inc., 489 N.Y.S.2d 220, 223 (App. Div. 1st Dep't 1985)). Plaintiffs must also show that "the principal . . . maintain[ed] control over key aspects of the undertaking." Comm. Union Ins. Co., 347 F.3d at 462. However, "the control asserted need not include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." Cleveland v. Caplaw Enters., 448 F.3d 518, 522 (2d Cir. 2006) (quotation marks and citation omitted).

"Commonly, an outsider will not be privy to the details of what conversations or conduct took place between a principal and the agent." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010). Thus, to sufficiently allege an actual agency relationship, "a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority." Skanga Energy & Marine Ltd. v. Arevenca, S.A., 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012).

Here, Plaintiffs have failed to allege that CCBC or CCBNY granted Lam actual authority to act on their behalf with

respect to the Reinsurance Contracts. First, Plaintiffs argue that Lam was an employee of CCBC and/or CCBNY because Lam had "legitimate CCB credentials, email domain and an authentic CCB telephone number." (FAC ¶ 59.) Although Plaintiffs allege that Lam was an employee of CCBC/CCBCNY in their briefing, the specific allegations in the FAC belie this allegation. See Hirsch v. Arthur Anderson & Co., 72 F.3d 1085, 1092 (2d Cir. 1995). According to the FAC, Lam's email address uses the "asia.ccb.com" domain. (See FAC ¶ 71.) Further, the job description on which Plaintiffs rely pertains to a Relationship Manager position at CCB Asia. (See FAC ¶¶ 74, 86 n.15.) Such a distinction is material because CCB Asia is allegedly a subsidiary of CCBC (see FAC ¶ 14), and under New York law, a subsidiary is a "legally distinct entit[y]" from its parent corporation. Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern., Inc., 2 F.3d 24 (2d Cir. 1993). Thus, the FAC's specific factual allegations concerning Lam's affiliation with CCB Asia undermine Plaintiffs' conclusory characterization of Lam as a "CCB" (i.e., CCBC/CCBNY) employee. (See FAC ¶ 86); Hirsch, 72 F.3d at 1092 ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint.")

Nor have Plaintiffs plausibly alleged facts showing that CCBC or CCBNY - not CCB Asia - exercised control over Lam. See Maung Ng We v. Merrill Lynch $ Co., Inc., No. 99 Civ. 9687, 2000 WL 1159835, at *4 (S.D.N.Y. Jan. 7, 2000). While "a parent corporation may be held accountable for the wrongs of its subsidiary under an agency theory, courts have long ago concluded that such a finding is remote." Spagnola v. Chubb Corp., 264 F.R.D. 76, 89 (S.D.N.Y. 2010) (citing Maung Ng We, 2000 WL 1159835, at *3). Here, the FAC contains no factual allegations showing that CCBC/CCBNY directed or controlled Lam's actions. Although Plaintiffs assert in conclusory fashion that CCBC controls CCB Asia (see FAC ¶ 14), such bare assertions are insufficient. See Spagnola, 264 F.R.D. at 90 n.14 (conclusory allegations that a subsidiary was an agent of the parent company need not be credited at the motion to dismiss stage); Coraggio v. Time Inc. Mag. Co., No. 94 Civ. 5429, 1995 WL 242047, at *3 (S.D.N.Y. April 26, 1995) (allegation that parent "controls" subsidiary held insufficient to allege single employer liability under Title VII).

Plaintiffs also attempt to show CCBC/CCBNY control of CCB Asia by referencing a regulatory filing in which CCBC purportedly refers to its branches and subsidiaries - including CCBNY and CCB Asia - as part of a

single "universal bank." (See FAC ¶ 15.) Plaintiffs'
selective quotation is misleading. The full statement, as
used in CCBC's 2022 Reduced U.S. Resolution Plan, merely
states that "[a]s a universal bank, CCB - the ultimate parent
company of all subsidiaries, including CCBNY - is
headquartered in Beijing, China." China Construction Bank,
2022 Reduced U.S. Resolution Plan Public Section Submission
at 4, https://www.fdic.gov/system/files/2024-07/ccbc-
1652207.pdf. This statement does nothing more than identify
CCBC as the parent company of its subsidiaries, including CCB
Asia, and contains no allegations or evidence regarding
CCBC's control over CCB Asia or its employees. Absent any
factual allegations showing that Lam's conduct was subject to
the control of CCBC or CCBNY – not merely CCB Asia - the Court
cannot reasonably infer that Lam had actual authority to issue
the LOCs at issue here. See Martime Ventures Intern., Inc. v.
Caribbean Trading & Fidelity, Ltd., 689 F. Supp. 1340, 1353
(S.D.N.Y. 1988) ("When the existence of an agency
relationship is uncertain, the courts often look to control
as a critical indicator."). As a result, as pleaded in the
FAC, the Court cannot hold CCBC or CCBNY liable for breach of
contract on the basis that these entities granted Lam actual
authority to issue the LOCs.

    ii.  Apparent Authority

Plaintiffs alternatively argue that they have pled sufficient facts that Lam had apparent authority to bind CCBC/CCBNY to the LOCs. "Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe the actual authority exists." Highland Capital Management LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010). Apparent authority "arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'" Minksoff v. Am. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996) (quoting Restatement (Second) of Agency § 27 (1958)). Thus, to recover on a theory of apparent authority, a party must sufficiently plead that (1) "the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representation of the agent." Herbert Constr. Co. v. Continental Ins. Co., 931 F.2d 989, 994 (2d Cir. 1991). In other words, the third party must have relied on "the misrepresentations of the agent because of some misleading conduct on the part of the principal – not the agent." Id. at

993 (quoting <u>Ford v. Unity Hosp.</u>, 299 N.E.2d 659, 664 (N.Y. 1973)). Further, "[a]pparent authority for an agency relationship depends upon reasonable reliance *at the time of a contract*." <u>Dinaco, Inc. v. Time Warner, Inc.</u>, 346 F.3d 64, 70 (2d Cir. 2003) (emphasis added).

Plaintiffs argue that they have adequately pleaded apparent authority based on CCBC/CCBNY's alleged appointment of Lam to a managerial role that provided a "full range" of banking services - services which, Plaintiffs contend, necessarily included the authority to issue LOCs. (<u>See</u> Pls.' Opp'n. to CCBC & CCBNY at 29.) Plaintiffs further assert that CCBC/CCBNY cloaked Lam with apparent authority by granting him access to their logos, stamps, signatures, and SWIFT codes. (<u>See</u> <u>id.</u> at 30.) Finally, Plaintiffs argue that, regardless of whether their allegations are sufficient, Defendants are estopped from denying apparent authority because they either negligently or intentionally allowed Lam to continue issuing LOCs after learning of his conduct. (<u>See</u> <u>id.</u>)

The flaw in Plaintiffs' argument is that the FAC contains no allegation that Plaintiffs relied on Lam's apparent authority at the time they entered into the Reinsurance Contracts. <u>See</u> <u>Dinaco</u>, 346 F.3d at 70. According to the FAC, the Transaction Entities solicited Plaintiffs to enter into

the Reinsurance Contracts. The Transaction Entities subsequently procured the LOCs from Defendants and delivered them directly to Plaintiffs. The FAC does not allege that Plaintiffs – who had no direct interactions with Defendants - relied on any representation by CCBC or CCBNY regarding Lam's authority to issue LOCs. In fact, the FAC does not even suggest that Plaintiffs were aware of Lam's identity at the time the contracts were executed.

To be sure, in apparent authority cases, "the information received by the third person may come . . . from third persons who have heard of the agent's authority through authorized or permitted channels of communication." Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., No. 01 Civ. 646, 2005 WL 1560577, at *5 (S.D.N.Y. June 30, 2005) (citing Ford v. Unity Hosp., 299 N.E.2d 659, 662 (N.Y. 1973)). However, the FAC contains no allegations that the Intermediaries, Corinthian, or the Transaction Entities provided Plaintiffs with any information reflecting CCBC/CCBNY's manifestations of Lam's authority at the time the Reinsurance Contracts were executed. Rather, any such information was allegedly conveyed to Plaintiffs only after they began to question the validity of the LOCs - several years after the contracts had been entered into. (See FAC ¶¶ 71-74.) Because Plaintiffs have failed to allege that they sufficiently relied on statements

29

by the agent or the principal at the time of contracting, they cannot allege a prima facie claim for breach of contract on a theory of apparent authority.

Plaintiffs argue that any failure to allege apparent authority is irrelevant because CCBC/CCBNY are estopped from denying apparent authority. (See Pls.' Opp'n to CCBC/CCBNY at 30.) "[A] principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." Minskoff v. Am. Exp. Travel Related Services Co., Inc., 98 F.3d 703, 708 (2d Cir. 1996). Referring to the allegation that a non-party insurance company reached out to CCBC/CCBNY regarding certain LOCs (see FAC ¶¶ 96-97), Plaintiffs contend that because Defendants "indisputably became aware of Lam-related LOCs in April 2022, they must be estopped from denying apparent authority. (Pls.' Opp'n to CCBC/CCBNY at 30.)

However, even if the non-party's correspondence put CCBNY on notice of Lam's conduct, Plaintiffs fail to allege any "reasonable reliance" by them on CCBNY's failure to act in April 2022, nor any "detrimental change in position"

resulting from such reliance. See <u>Hidden Brook Air, Inc. v.</u>
<u>Thabet Aviation Intern. Inc.</u>, 241 F. Supp. 2d 246, 264
(S.D.N.Y. 2002). As previously noted, Plaintiffs were not
aware of Lam's identity until July 2023 - more than a year
after the non-party insurance company's alleged
correspondence with CCBNY. Moreover, the FAC does not allege
that Plaintiffs were even aware of that correspondence at the
time it occurred. Accordingly, Plaintiffs have failed to
allege that CCBC/CCBNY are estopped from denying Lam's
apparent authority.

Because Plaintiffs have failed to allege an agency
theory of liability sufficiently supporting their breach of
contract claim, Plaintiffs fail to state a claim for breach
of contract. Accordingly, Plaintiffs' breach of contract
claims against CCBC and CCBNY (Counts I and II) are **DISMISSED**
without prejudice.

C. <u>Fraud Claim Against CCBC</u>

Plaintiffs bring a claim for fraud against CCBC in the
alternative to its breach of contract claim. Plaintiffs
allege that Lam and other authorized agents of CCBC
orchestrated a scheme to defraud Plaintiffs by materially
misrepresenting the validity of the issued LOCs to Plaintiffs
and the Intermediaries. In response, CCBC argues that (1) the
fraud claim must be dismissed as duplicative of the breach of

contract claim, (2) Plaintiffs fail to allege that they reasonably relied on the purported material misrepresentations, and (3) Plaintiffs fail to establish *respondeat superior* liability. (See CCBC/CCBNY Opp'n at 21-33.)

Plaintiffs contend that their fraud claim is not duplicative of their breach of contract claim because the fraud claim does not arise out of the contract and is pled in the alternative. As an initial matter, "[i]t is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims . . . regardless of whether the alleged contract is unenforceable." Stillman v. Townsend, No. 05 Civ. 6612, 2006 WL 2067035, at *6 (S.D.N.Y. July 26, 2006). For this reason, plaintiffs generally cannot plead fraud as an alternative to a breach of contract claim. See Maricultura Del Norte v. World Business Capital, Inc., 159 F. Supp. 3d 368, 378 (S.D.N.Y. 2015). However, "where there are allegations of fraud in the inducement and a dispute as to whether a valid contract exists, parties can and routinely do plead in the alternative fraud, unjust enrichment, and breach of contract." Burton v. Iuyogi, Inc., No. 13 Civ. 6929, 2015 WL 4385665, at *11 (S.D.N.Y. Mar. 16, 2025) (citing Net2Globe Int'l, Inc., v. Time Warner Telecomm of N.Y., 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003)). Here,

because Defendants dispute the validity of the LOCs, it is not clear to the Court that a valid and enforceable contract controlling the dispute exists such that a claim for fraud would be inappropriate.

Although Plaintiffs would typically be permitted to plead fraud in the alternative in such circumstances, Plaintiffs fail to plead sufficient facts to hold CCBC liable for Lam's allegedly fraudulent conduct. Plaintiffs' fraud claim appears to be asserted on a *respondeat superior* theory based on Lam's conduct. The FAC alleges that Lam, acting on behalf of CCBC, "made affirmative material misrepresentations to the Intermediaries and Plaintiffs, and omitted and concealed material facts . . . in connection with the LOCs." (FAC ¶ 119.)

Under New York law, "an employer may be held liable for the tortious acts of an employee committed within the scope of his employment." Abdelhamid v. Altria Grp., Inc., 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007); see also Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) ("It is black-letter agency law in New York that an employer is liable for the representations of its agents when those representations are made within the scope of the agent's employment.") (citing 2A N.Y. Jur.2d Agency & Indep. Contractors § 290 (2007)). "The key element of *respondeat*

*superior* . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable." <u>Abdelhamid</u>, 515 F. Supp. 2d at 398. "'The determination of whether an employer-employee relationship exists turns on whether the alleged employer exercises control over the results produced, or the means used to achieve the results.'" <u>De Sole v. Knowdler Gallery, LLC</u>, 137 F. Supp. 3d 387, 417 (S.D.N.Y. 2015) (quoting <u>Chuchuca v. Chuchuca</u>, 890 N.Y.S.2d 573, 575 (App. Div. 2d Dep't 2009)).

Plaintiffs' *respondeat superior* argument suffers from the same deficiencies as its agency theory. As discussed above, Plaintiffs fail to allege that Lam was employed by CCBC or that CCBC otherwise controlled Lam's ability to issue LOCs. Absent such allegations, Plaintiffs cannot hold CCBC vicariously liable for fraud on a *respondeat superior* theory. <u>See De Sole v. Knowdler Gallery, LLC</u>, 137 F. Supp. 3d at 417 (dismissing fraud claims against a parent company because "the doctrine of *respondeat superior* does not render a parent company liable for the conduct of a subsidiary").

Accordingly, Plaintiffs' fraud claim against CCBC (Count III) is **DISMISSED** without prejudice.

D. <u>Negligent Supervision Claim Against CCBC</u>

Plaintiffs bring a claim for negligent supervision against CCBC, arguing that CCBC knew or should have reasonably known about Lam's propensity to participate in the fraudulent scheme. To state a claim for negligent supervision under New York law, in addition to the standard elements of negligence, a plaintiff must show "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam).

As already discussed, Plaintiffs have failed to sufficiently allege the existence of an employer-employee relationship between Lam and CCBC.

Accordingly, Plaintiffs' claim for negligent supervision against CCBC (Count V) is **DISMISSED** without prejudice.

### E. UCC Claim Against CCBC/CCBNY

Plaintiffs allege that CCBNY - and by extension, CCBC - violated N.Y. U.C.C. §§ 5-108 and 5-109[7] by refusing to honor the LOCs when Plaintiffs presented a sight draft for

---

[7] New York has adopted Article 5 of the Uniform Commercial Code. See N.Y. U.C.C. § 5-108.

payment. (See FAC ¶¶ 145-62.) In response, CCBC and CCBNY contend that they had no obligation to comply with § 5-108 and § 5-109 because they denied having issued the LOCs at the time of presentment and because Plaintiffs knew that the LOCs were fraudulent when they submitted the sight drafts. (See CCBC & CCBNY Mem. at 33.)

The New York UCC defines a "letter of credit" as a "definite undertaking . . . by an issuer to a beneficiary... to honor a documentary presentation by payment or delivery of an item of value." N.Y. U.C.C. § 5-102(a)(10). Thus, for the UCC to apply, the Court must first determine that CCBNY made a definite undertaking to honor the presentments. As discussed above, the FAC fails to allege that Lam had actual or apparent authority to bind CCBNY to the LOCs. Absent such authority, there can be no undertaking attributable to CCBNY, and therefore, no valid letter of credit under the N.Y. U.C.C. To hold otherwise would effectively compel banks to honor facially compliant presentments under instruments they never issued. Therefore, Plaintiffs' failure to allege that Lam had authority to bind CCBNY to the LOCs is fatal to their claim that CCBNY was obligated to comply with Section 5-108 upon presentment of the sight drafts. As a result, Plaintiffs' UCC claims against CCBC (Count VII) and CCBNY (Count VIII) are **DISMISSED** without prejudice.

F. Declaratory Relief against CCBC

Finally, the Court dismisses Plaintiffs' claims for declaratory relief against CCBC. CCBC argues that Plaintiffs' request for a declaratory relief should be characterized as a request for injunctive relief and that regardless, such a request is improper because Plaintiffs seek money damages. Plaintiffs fail to address any of these arguments in their opposition motion. A district court "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's argument that the claim should be dismissed." Williams v. Mirabal, No. 11 Civ. 366, 2013 WL 174187, at *2 (S.D.N.Y. Jan. 16, 2013) (quoting Lipton v. Cnty. Of Orange, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004). In light of Plaintiffs' failure to address these claims in their opposition, the claims for declaratory relief are deemed abandoned. See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08 Civ. 442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014); Robinson v. Fischer, No. 09 Civ. 8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010).

Accordingly, Plaintiffs' claim for declaratory relief against CCBC (Count XI) is **DISMISSED**, without prejudice.

## IV. CCB ASIA'S MOTION TO DISMISS

CCB Asia separately moves to dismiss Plaintiffs' claims for fraud (Count IV) and negligent supervision (Count VI) on

the grounds that the Court lacks personal jurisdiction and that the FAC fails to state a claim for relief for each cause of action.

A. Personal Jurisdiction

Plaintiffs advance three grounds for this Court's exercise of personal jurisdiction over CCB Asia. First, Plaintiffs allege that CCB Asia's business activities in New York bring them within the reach of Section 302(a)(1) of New York's long-arm statute. Second, Plaintiffs allege that CCB Asia committed a tortious act causing an injury in New York bringing it within reach of Section 302(a)(3) of New York's long-arm statute. Third, Plaintiffs assert that the Court has personal jurisdiction over CCBC/CCBNY pursuant to the FSIA, 28 U.S.C. §§ 1330, 1603, 1605.

1. N.Y. C.P.L.R. § 302(a)(1)

There is substantial disagreement between the parties as to whether CCB Asia has sufficient contacts with the State of New York for purposes of both Section 302(a)(1) and the constitutional "minimum contacts" doctrine. For purposes of clarity and efficiency, the Court discusses the Section 302(a)(1) and due process contacts requirements simultaneously. See Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC, 03 Civ. 9471, 2004 WL 1574645, at *5 (S.D.N.Y. July 13, 2004) (noting that the analysis of the "transacts business"

prong of Section 302(a)(1) is "in essence, the same as that established by the United States Supreme Court to evaluate the constitutionality of personal jurisdiction under long-arm statutes.")

  i. CCB Asia's Contacts with New York

  As an initial matter, the FAC fails to allege that CCB Asia itself transacted business in New York within the meaning of Section 302(a)(1).[8] Plaintiffs attempt to impute CCBC/CCBNY's New York contacts to CCB Asia by referring to all three defendants as "CCB" in the FAC and further alleging that "CCB" operates in New York through CCBNY. However, as discussed above, the FAC fails to allege that CCBC/CCBNY and CCB Asia constitute a single entity. The FAC merely alleges that CCB Asia is a wholly owned subsidiary of CCBC but does not include sufficient facts to show that CCBC controls CCB Asia. In their opposition brief, Plaintiffs allege several additional facts, through various attachments, regarding the relationship between CCBC and CCB Asia that are not alleged

---

[8] The FAC alleges that CCB Asia purposefully availed itself of New York law by initiating legal proceedings in the Southern District of New York. (See FAC ¶ 25.) That proceeding was a petition for discovery under 28 U.S.C. § 1782, seeking evidence for use in foreign litigation in Hong Kong and Italy concerning the recovery of loans made to foreign entities. See In re China Constr. Bank (Asia) Corp. Ltd., No. 1:23-mc-00017 (S.D.N.Y.). Plaintiffs' position is unpersuasive. Plaintiffs' claims are unrelated to the subject matter of that discovery proceeding and they do not arise from CCB Asia's limited contact with New York. See Licci, 732 F.3d at 168-69.

in the FAC. (See Pls.' Opp'n to CCB Asia at 21-23.) These include assertions that CCB Asia is financially supported by CCBC, that the two entities use the same logo and email domain, and that CCBC exercises complete managerial control over CCB Asia, as allegedly evidenced by CCB Asia's Chairman also serving as an Executive Vice President of CCBC. (See Pls.' Opp'n to CCB Asia at 21-23.)

Plaintiffs' additional allegations fail to impute CCBC's contacts with New York to CCB Asia. Under New York law, "a court may exercise personal jurisdiction over a subsidiary based on its jurisdiction over the parent company only when the subsidiary is an 'alter ego' or 'mere department' of the parent company." Fagan v. Republic of Austria, No. 08 Civ. 6715, 2011 WL 1197677, at *17 (S.D.N.Y. Mar. 25, 2011); see also Drucker Cornell v. Assicurazioni Generali S.p.A. Consolidated, No. 97 Civ. 2262, 2000 WL 284222, at *3 (S.D.N.Y. Mar. 16, 2000)("[T]he entity allegedly doing business in New York . . . is the parent firm, and the foreign entity over which jurisdiction is sought . . . is the subsidiary - both the mere department and agency grounds for attribution may be applied.").

Courts assess four considerations to determine whether a subsidiary and a parent are alter egos: "(1) whether there exists common ownership and the presence of an interlocking

directorate and executive staff, (2) the degree of financial dependency of the subsidiary on the parent, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of the parent's control of the subsidiary's marketing and operational policies." Fagan, 2011 WL 1197677 at *17 (citing Drucker Cornell, 2000 WL 284222, at *3)).

The only factor that Plaintiffs adequately allege is the common ownership of CCB Asia and CCBC. (See FAC ¶ 14.) As to financial dependency, Plaintiffs point to a statement on CCB Asia's website that it is "financially 'fully supported'" by CCBC. (See Pls.' Opp'n to CCB Asia at 21 (quoting "Ex. 13," Dkt. No. 102-14).) However, the full statement from the "Overview" page of that website reads: "Fully supported by CCB, CCB (Asia) launches synergistic businesses such as entrusted payment, export account receivable risk participation, discount against draft avalisation and more." (Ex. 13 at 2.) This statement does not clarify whether CCB Asia is financially dependent on CCBC, and it is unclear whether "fully supported" refers to financial support at all. Second, Plaintiffs fail to establish CCBC's parental intrusion into CCB Asia's selection of personnel. Plaintiffs argue that because CCB Asia's Chairman is also CCBC's

Executive Vice President, CCBC must exercise complete control over CCB Asia. However, "[i]t has been established that overlapping officers and directors are 'intrinsic to the parent-subsidiary relationship,' and that they are not determinative as to whether the subsidiary is a 'mere department' of the parent." J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (citing Porter v. LSB Indus., Inc., 600 N.Y.S.2d 867, 873 (App. Div. 4th Dep't 1993)). Finally, Plaintiffs' reliance on the fact that CCBC files joint public and regulatory reports with CCB Asia is unavailing because "consolidated financial reporting is typical in a parent-subsidiary relationship." J.L.B. Equities, Inc., 131 F. Supp. 2d at 550 (citing Cornell v. Assicurazioni Generali S.p.A., No. 97 Civ. 2262, 2000 WL 284222, at *4 (S.D.N.Y. 2000)).

Accordingly, under both the constitutional minimum contacts test and Section 302(a)(1), CCB Asia lacks sufficient direct contacts with New York for this Court to exercise jurisdiction over it.

ii. Agency Theory of Personal Jurisdiction

Alternatively, Plaintiffs advance an agency theory of personal jurisdiction, arguing that Lam's contacts with New York should be imputed to CCB Asia. Section 302(a)(1) provides that "a court may exercise personal jurisdiction over any

non-domicilary . . . who in person *or through an agent* transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1) (emphasis added). To establish an agency relationship for jurisdictional purposes, Plaintiffs must show "that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Hau Yin To v. HSBC Holdings, PLC, 700 Fed. App'x. 66, 68 (2d Cir. 2017) (citing Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)); see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 122 (2d Cir. 2021) ("[A] defendant can purposefully avail itself of a forum through the action of a third party by directing its agents or distributors to take action there"); Galagy v. Bulletin Co., Inc., 504 F.2d 1062, 1065 (2d Cir. 1974) (agent must act "at the request and for the business purpose of" the principal). "The question of control turns on 'the realities of the relationship in question rather than the formalities of agency law." Hau Yin To, 700 F. App'x at 68 (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986)).

Plaintiffs may have adequately alleged the existence of a formal agency relationship between Lam and CCB Asia, given that Lam was an employee of CCB Asia. However, Plaintiffs

have failed to establish that CCB Asia directed any of Lam's contacts with New York. The FAC alleges, in part, that Lam issued the LOCs while employed at CCB Asia and made them payable at CCBNY, relying on CCBNY's status as a NAIC-approved issuer of letters of credit. The FAC also alleges that Vesttoo, a New York-based entity, coordinated the delivery of the LOCs with Lam. If Lam's New York contacts could be imputed to CCB Asia, the Court would have little difficulty finding personal jurisdiction based on those contacts. However, Plaintiffs do not allege sufficient facts to show that Lam's activities in or directed toward New York were undertaken at CCB Asia's direction. Absent from the FAC is any allegation that Lam acted at CCB Asia's direction or with its *consent* in negotiating the Reinsurance Contracts in Vesttoo's offices in New York. See Barron v. Helbiz Inc., 2023 WL 5672640, at *5 (S.D.N.Y. Sept. 1, 2023) (holding that failure to allege that the principal directed the agent to take any actions to perpetuate a fraud in New York is fatal to personal jurisdiction); East N.Y. Sav. Bank v. Republic Realty Mortg. Corp., 402 N.Y.S.2d 639, 641 (App. Div. 2d Dep't 1978) ("The activities of the representative in New York will be attributed to the nondomiciliary if it requested the performance of those activities in New York.") A principal's control over an agent may be established where the non-

resident defendant played "an active role" or was the "primary actor in the specific matter in question." Zobay v. MTN Group Limited, 695 F. Supp. 3d 301, 330 (E.D.N.Y. 2023) (citing Spetner v. Palestine Inv. Bank, 70 F.4th 632, 640, 645 (2d Cir. 2023). The FAC contains no allegations which permit a reasonable inference that CCB Asia played an active role in directing Lam's activities in New York or otherwise consented to such activities. See Edwardo v. Roman Catholic Bishop of Providence, 66 F.4th 69, 75 (2d Cir. 2023). Although Plaintiffs argue that CCB Asia may be liable for Lam's actions under the theory of *respondeat superior*, such allegations cannot establish personal jurisdiction, which requires Plaintiffs to show that Lam's conduct in New York was undertaken at CCB Asia's direction, with CCB Asia's knowledge, and under CCB Asia's control. See Barron, 2023 WL 5672640, at *5 (holding that, even assuming the agent had authority to bind the principal, the complaint failed to establish personal jurisdiction because it did not allege that the principal directed or was aware of the agent's conduct in New York.)

In sum, Plaintiffs have not established that Lam's contacts in New York were purposefully directed by CCB Asia. Accordingly, the Court does not have personal jurisdiction over CCB Asia under Section 302(a)(1).

2. <u>Personal Jurisdiction Pursuant to the FSIA</u>

Alternatively, Plaintiffs argue that the Court may exercise personal jurisdiction over CCB Asia under the FSIA because it is an "agency or instrumentality" of the Peoples Republic of China ("PRC"). The FSIA grants federal courts subject matter jurisdiction over actions against a foreign state when the state is not entitled to immunity under the FSIA or any applicable international agreement. <u>See</u> 28 U.S.C. § 1330(a). Where subject matter jurisdiction exists under the FSIA, personal jurisdiction over the foreign state is also established. <u>See</u> 28 U.S.C. § 1330(b).

The FSIA defines a "foreign state" to include its agencies or instrumentalities, which are entities that are either organs of the state or majority-owned by it. <u>See</u> 28 U.S.C. § 1603(b)(1)-(2). A foreign state, including its agencies or instrumentalities, is not immune from jurisdiction where the action is based on commercial activity carried on in the United States. <u>See</u> 28 U.S.C. § 1605(a)(2).

Plaintiffs contend that CCB Asia is an "agency or instrumentality" of the PRC pursuant to the "organ" prong of 28 U.S.C. § 1603(b)(2).[9] While there is no definitive test

---

[9] In the FAC, Plaintiffs initially allege that FSIA confers jurisdiction over CCB Asia because the PRC owns a majority of shares in CCB Asia. However, under FSIA, a foreign state must have direct ownership of the majority of shares. <u>See</u> <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 477 (2003). CCB Asia is directly owned by CCBC and Plaintiffs abandon this

for defining an "organ" under the FSIA, the Second Circuit has identified several considerations, including whether (1) a foreign state created the entity for a national purpose; (2) a foreign state actively supervises the entity; (3) the entity holds exclusive rights to some right in a state; and (4) the entity is treated as a government organ under the foreign state's laws. See Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004).

In asserting that CCB Asia is an "organ" of the PRC, Plaintiffs assert a variety of arguments that only relate to CCBC, CCB Asia's parent company. None of the facts Plaintiffs allege, either in the FAC or in their opposition, contain information related to CCB Asia's relationship with the PRC. In light of the FAC's failure to allege that CCBC is wholly dominated by CCB Asia, Plaintiffs have failed to establish a prima facie case of personal jurisdiction under the FSIA.

3. N.Y. C.P.L.R. § 302(a)(3)

Plaintiffs also argue that the Court has personal jurisdiction under New York Civil Practice Law and Rules Section 302(a)(3) ("Section 302(a)(3)"). To establish jurisdiction under Section 302(a)(3), Plaintiffs must make a

---

line of argument in their opposition to CCB Asia's motion to dismiss. Accordingly, the Court will not exercise personal jurisdiction under FSIA under this theory.

prima facie showing that (1) CCB Asia committed a tortious act outside of New York; (2) the cause of action arises from that act; and (3) the act caused injury to a person or property within New York. See Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP, 589 F. Supp. 3d 401, 413 (S.D.N.Y. 2022); see also N.Y. C.P.L.R. § 302(a)(3). In addition, Plaintiffs must adequately allege that (4) either (a) CCB Asia regularly does business, or engages in any other persistent course of conduct, or derives substantial revenue from goods or services rendered, in New York, or (b) that CCB Asia expects or should reasonably expect the tortious act to have consequences in New York and that CCB Asia derives substantial revenue from interstate or international commerce. N.Y. C.P.L.R. § 302(a)(3)(i)-(ii); see also Snowbridge, 589 F. Supp. 3d at 413.

Plaintiffs' theory of personal jurisdiction under Section 302(a)(3) is that CCB Asia committed tortious acts by issuing the fraudulent LOCs and negligently supervising Lam. CCB Asia contends that even if a tort occurred, it did not result in an injury to a person in New York. (See CCB Asia Reply at 9.)

The Court cannot exercise personal jurisdiction over Plaintiffs' fraud claim against CCB Asia under Section 302(a)(3) for the same reasons it cannot exercise it under

Section 302(a)(1): Plaintiffs fail to allege an agency theory of personal jurisdiction imputable to CCB Asia regarding Lam's alleged conduct. See Edwardo v. Roman Catholic Bishop of Providence, 66 F.4th 69, 75 (2d Cir. 2023) (a tortfeasor is an agent of a nondomiciliary under § 302(a) only where the nondomiciliary "requested the performance of *those activities* in New York." (emphasis added)).

However, Section 302(a)(3) does not foreclose jurisdiction over Plaintiffs' negligent supervision claim, as CCB Asia is alleged to be the direct tortfeasor. CCB Asia contends that Plaintiffs have failed to allege an injury in New York under Section 302(a)(3). According to CCB Asia, to plead injury in New York in a commercial tort action, a plaintiff must allege harm in the form of lost New York-based sales or customers. (See id. (citing Darby Trading, Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 337 (S.D.N.Y. 2008)).

"[C]ourts determining whether there is injury in New York sufficient to warrant [Section] 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" Darby Trading, 568 F. Supp. 2d at 336. The "original event" is distinguished from both the initial tort, the final economic injury, and the felt consequences of the tort. See Hermann v.

<u>Sharon Hosp., Inc.</u>, 522 N.Y.S.2d 581, 583 (App. Div. 2d Dep't 1987). Here, the first effect of CCB Asia's negligent supervision was felt when CCBNY declined to honor Plaintiffs' sight draft upon presentment. That event, which occurred in New York where CCBNY is headquartered, triggered Plaintiffs' reinsurance losses because it formally caused their loss of reinsurance coverage. <u>See</u> <u>Tan v. SMS Investment Group, LLC</u>, 2016 WL 1171605, at *13 (E.D.N.Y. Mar. 24, 2016) (finding that the original event causing the injury occurred where the entity refused to refund plaintiffs).[10] Accordingly, Plaintiffs have sufficiently alleged an injury in New York for purposes of Section 302(a)(3).

Under Section 302(a)(3), Plaintiffs must also show that CCB Asia "derives substantial revenue" either from New York or from interstate or international commerce. N.Y. C.P.L.R. § 302(a)(3)(i)-(ii). To measure "substantial revenue," courts look to "revenue from a particular source . . . and the percentage of a defendant's total revenue that comes from that source." <u>Paige v. Digital Business Networks Alliance, Inc.</u>, 2025 WL 753952, at *9 (S.D.N.Y. Mar. 10,

---

[10] CCB Asia's reliance on <u>Darby</u> is misplaced. In <u>Darby</u>, the plaintiff alleged an injury based on lost revenue and sales. The court clarified that when such losses are claimed, they must occur within the New York market. <u>See</u> <u>Darby</u>, 568 F. Supp. 2d at 336-37. <u>Darby</u> does not otherwise stand for the broader proposition that only the loss of New York sales or customers can satisfy the situs-of-injury requirement under Section 302(a)(3).

2025). Under Section 302(a)(ii), Plaintiffs must show that a defendant "should have had any expectations of consequences in the State of New York" where defendant has made some "discernible effort to directly or indirectly serve the New York market." 48th Rest. Assocs. LLC v. Avra Hosp. LLC, No. 19 Civ. 7708, 2022 WL 203592, at *6 (S.D.N.Y. Jan. 24, 2022) (quotation marks and citation omitted).

The FAC is mostly devoid of any facts regarding CCB Asia's sources of revenue.[11] However, because Plaintiffs have made a sufficient start toward establishing personal jurisdiction under Section 302(a)(3), the Court will permit limited jurisdictional discovery on the issue of CCB Asia's revenue sources under Section 302(a)(3)(i) and (ii). See Allojet PLC v. Vantgage Assocs., No. 04 Civ. 05223, 2005 WL 612848, at *7 (S.D.N.Y. March 15, 2005). The scope of this discovery should be limited only to the question of whether CCB Asia "derives substantial revenue" either from New York or from interstate or international commerce such that it should expect consequences in the State of New York. It should not encompass sources of revenue from CCBC/CCBNY

---

[11] Plaintiffs instead attempt to impute CCBC's sources of revenue to CCB Asia. (See Pls.' Opp'n at 28.) As discussed, CCBC and CCB Asia are distinct entities and accordingly any source of revenue for CCBC cannot be imputed to CCB Asia.

Accordingly, CCB Asia's motion to dismiss pursuant to Rule 12(b)(2) is **DENIED** without prejudice to renew at the close of jurisdictional discovery. Because the Court cannot find based on the existing record that it has personal jurisdiction over CCB Asia, the Court will refrain from addressing the merits of CCB Asia's motion to dismiss under Rule 12(b)(6) until the close of jurisdictional discovery.

**V. <u>ORDER</u>**

**ORDERED** that the motion (Dkt. No. 92) of Defendants China Construction Bank Corporation ("CCBC") and China Construction Bank New York ("CCBNY") to dismiss all claims against them in the First Amended Complaint (Dkt. No. 47) of plaintiffs Incline Casualty Company and Redpoint County Mutual Insurance Company ("Plaintiffs") is **GRANTED** and Plaintiffs' claims against CCBC and CCBNY are **DISMISSED** without prejudice; it is further

**ORDERED** that the motion (Dkt. No. 78) of Defendant China Construction Bank (Asia) ("CCB Asia") to dismiss the First Amended Complaint (Dkt. No. 47) for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED** without prejudice to renew following the close of jurisdictional discovery; it is further

**ORDERED** that the motion (Dkt. No. 78) of Defendant CCB Asia to dismiss the First Amended Complaint (Dkt. No. 47) for

failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is **DENIED** without prejudice, and it is further

    **ORDERED** that all remaining pretrial matters, including jurisdictional discovery and any motions for leave to amend, will be referred by separate order to the assigned Magistrate Judge for supervision and case management.

    The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 78 and 92.


**SO ORDERED.**

Dated:    6 August 2025
            New York, New York

                                            _____
                                              Victor Marrero
                                                U.S.D.J.